**In re Ronald WHALEY, Debtor.**

**Brian F. Leonard, Trustee of the Chapter 7 Bankruptcy Estate of Ronald Whaley, Plaintiff,**

v.

**Mountainwest Financial Corp. d/b/a Prime Option Services, Defendant.**

**Bankruptcy No. 95–33904.
Adversary No. 97–3049.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Jan. 29, 1999.

---

Joseph W. Lawver, Messerli & Kramer, P.A., Minneapolis, MN, for defendant.

Brian F. Leonard, Leonard, O'Brien, Wilford, Spencer & Gale, Ltd., Minneapolis, MN, for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for trial. The Plaintiff appeared on behalf of the Debtor's bankruptcy estate. The Defendant appeared by its attorney, Joseph W. Lawver. Upon the evidence ad-duced at the trial, and the arguments and memoranda of counsel, the Court makes the following:

### FINDINGS OF FACT

1. The Debtor filed a voluntary petition for relief under Chapter 7 on August 15, 1995.

2. From November, 1993 to February, 1996, the Debtor lived out of wedlock with a women named Kim LaRoue, in a house in White Bear Lake, Minnesota. They held title to the house as joint tenants. Other relatives of both of them-her two sons, his daughter, and her uncle-occupied the house with them.

3. The Debtor and LaRoue were engaged when they started this living arrangement. However, they never became married, and neither adopted the other's children.

4. The Debtor had suffered a disabling injury to his left shoulder and arm in 1992; he has received Social Security disability benefits since early 1995.

5. In the summer of 1995, the Debtor was unemployed. Other than Social Security benefits, his sole source of personal income at that time was sporadic motor vehicle repair work he did on a job-by-job basis.[1] He was also receiving child support payments from the mother of his daughter.

6. At the same time, LaRoue was conducting a licensed daycare business at the house she shared with the Debtor. She derived regular income from this business. She was also receiving Social Security benefits for her own children.

7. At some point before June, 1995, the Debtor and LaRoue established a joint checking account at TCF Bank Minnesota at its Bloomington, Minnesota branch. Into this account, the Debtor deposited his own Social Security disability benefits, the child support payments he received, and income he received from vehicle-repair jobs and any employment he had.

---

1. As the Debtor put it at trial, "towards the fall of 1995" he took three to four months of part-time employment as a clerk at a local convenience store. It appears that he held this employment, and received income from it, after the events relevant to this adversary proceeding.

8. In the summer of 1995, LaRoue maintained a checking account under her own name. Into this account, she customarily deposited the Social Security benefits that her minor children received, as well as income from her daycare business.

9. From time to time, LaRoue deposited funds from her daycare earnings into the joint TCF account.

10. Over the course of her cohabitation with the Debtor, LaRoue used both checking accounts to make payment on the debts that they incurred to maintain their household and to raise the children in it. The two were jointly liable under contract on the major debts, like their home mortgage, household utilities, and financing for the purchase of vehicles. One or the other of them was the nominally-liable party on the remainder, such as revolving charge card accounts. The understanding between the two of them was that they would use revolving credit to meet household needs as necessary.

11. It was the express intention of both the Debtor and LaRoue that their combined financial resources from income, government benefits, and family support payments would be applied to their combined household expenses, whether the funds had been commingled in the joint TCF account or held separately on deposit in LaRoue's personal account.

12. The Debtor acquiesced to LaRoue's management of this arrangement when he consented to opening the joint TCF account with her. Thereafter, he allowed her to write checks off the TCF account as well as her own, and he supported her in directing their combined receipts to payment on the combined debts of the household as best she could.

13. It was, therefore, the intent of both the Debtor and LaRoue that the funds deposited in the joint TCF account were to be disbursed for purposes that they both approved or ratified, to be applied on debts on which they were jointly liable, or to pay for goods or services from which they both derived benefit or enjoyment regardless of who was nominally liable for their cost. It was also their intent that either party could issue checks on the TCF account for such payments.

14. As between the Debtor and LaRoue, LaRoue did more of the work in managing the household finances, including the payment of bills as due.

15. The Defendant provides unsecured revolving credit through the MasterCard charge program. At some point before April 1, 1995, it opened a "Prime Option MasterCard account" for LaRoue. The Debtor was not a named holder of this account; he had not signed an agreement to be liable on it; and he did not ever incur debt chargeable to him personally on it.

16. LaRoue customarily used the Prime Option account for expenditures for the household. These included purchases of household goods and supplies; payment for meals and lodging while she, the Debtor, and the children were traveling; and the funding for small improvements to the house.

17. As of April 4, 1995, the balance on LaRoue's Prime Option account was zero. Between that date and May 20, 1995, LaRoue used the account to make purchases of a total of $1,713.51, and to obtain a cash advance of $1,000.00. All of the purchases were for household items or travel, from which the Debtor benefitted or got enjoyment. LaRoue used the cash advance to make payments on the financing for the pickup truck that she and the Debtor maintained for the household.

18. Reduced by a small payment that LaRoue had made during that period, and increased by finance charges, the balance on the account as of June 4, 1995, was $2,726.42.

19. On June 6, 1995, the balance in the joint TCF checking account was $1550.42. By the close of banking on June 11, 1995, two more checks were honored, in a total of $64.36. Thus, as of the opening of banking on June 12, 1995, the balance in the account was $1486.06.

20. On June 12, 1995, the Debtor made two deposits to the joint TCF account. The first, in the sum of $344.56, was from income he had received from an auto repair job. The second, in the sum of $30,584.00, was some form of compensation, award, or bene-

fit attributable to his disability or to the event that caused it.[2]

21. No deposit was made into the TCF account from LaRoue's personal income or separate property between June 3 and July 3, 1995.[3]

22. On June 20, 1995, the Defendant received a check drawn by LaRoue on the joint TCF account, in the sum of $2,726.42. It credited LaRoue's Prime Option account in that amount, to note a new balance of zero. TCF Bank paid the check on June 21, 1995.

23. On June 20, 1995, the Debtor held the following assets, of the following value:

| | |
|---|---|
| Funds on deposit, TCF Bank | 150.00 |
| Household goods and furnishings, undivided half interest | 3000.00 |
| Wearing apparel, self and daughter | 500.00 |
| Watch and ring | 50.00 |
| Van (motor vehicle) undivided half interest, equity | –0– |

24. On that date, June 20, 1995, the Debtor had outstanding unsecured debt of approximately $22,500.00. In addition, the claim in favor of TCF Bank that was secured by a lien against his van exceeded the current value of the van by approximately $7,000.00.

---

**2.** The evidence as to the source and nature of the payment is in conflict. The Debtor's Statement of Financial Affairs for his bankruptcy case, which is in evidence, recites that it was a payment of accumulated Social Security disability benefits. In his testimony, the Debtor described this payment as "back pay from the Fortis Company," an insurer that had been paying him benefits on a policy of private disability insurance. The conflicted evidence does not permit a specific finding on this point, but it does establish that the funds were attributable entirely to the Debtor's personal entitlement.

**3.** LaRoue testified that she had made several deposits "into the accounts" before and during this period. Her testimony was very confusing, and contradicted the hard evidence of the TCF bank statements produced by the Plaintiff.

**4.** In pertinent part, this statute provides:
  (a) The trustee may avoid any transfer of an interest of the debtor in property, ... that was made ... on or within one year before the date of the filing of the [bankruptcy] petition, if the debtor voluntarily or involuntarily—
    ...

## CONCLUSIONS OF LAW

### I. Issues

#### A. Theory of Plaintiff's Complaint

The Plaintiff seeks to avoid the transfer of $2,726.42 that was made from the Debtor, and ultimately effectuated when TCF honored the check that LaRoue tendered. He then seeks to recover the avoided transfer via a money judgment against the Defendant. He invokes 11 U.S.C. § 548(a)(2)[4] as the source of his avoidance power.[5]

In his trial brief, the Plaintiff expands on his theory. First, he posits that "the Debtor was the owner of 99 percent of the funds in the [TCF] account at the time that the payment was made," based on the source of the deposits made to the account between June 6 and June 21, 1995. He then points out that LaRoue used the funds in the account to pay an obligation on which the Debtor had no personal liability; thus, he argues, the Debtor received no consideration for the payment. Then positing that the Debtor was insolvent at the time, the Plaintiff submits that he has proved up the elements of § 548(a)(2).

#### B. Theory of Defendant's Defenses.

In response, the Defendant challenged the Plaintiff's *prima facie* case and raised an

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation ...
In his complaint, the Plaintiff made a general citation to 11 U.S.C. § 548(a). In a document entitled "Plaintiff's Notice of Clarification of Complaint," filed on October 7, 1997, he stated that his complaint was "deemed to include causes of action under 11 U.S.C. § 548(a)(1) and (2)," and went on to state that he would provide proof that met § 548(a)(2). Since he produced no evidence going to the "actual fraud" provisions of § 548(a)(1) at all, he is deemed to have abandoned that theory of avoidance.

**5.** The Plaintiff pleaded unjust enrichment as an alternate theory of recovery, and mentioned it in his trial brief. He never identified its elements, however, and presented no evidence going to the theory. Accordingly, he is deemed to have forgone this theory and claim.

affirmative defense. It maintains that the funds that LaRoue had used to make the payment were not "an interest of the [D]ebtor in property," as required by the prefatory language of § 548(a). It argues two bases for this proposition. The first was that LaRoue had regularly deposited substantial sums from her own earnings and assets into the TCF account. The second was that, in any event, the unfettered right to use the funds that LaRoue enjoyed as a joint account holder meant that any funds so transferred could not be considered to have been property of the Debtor.

In the alternative, the Defendant maintains that the Debtor did receive reasonably equivalent value for any transfer of his property that was made. Again, it asserts bases-in-the-alternative for this proposition. The first comes out of its assertion that the Debtor and LaRoue "co-mingled their funds[,] . . . establishing an identity of interest." This, it submits, would allow the Court to ignore their separate legal existence for the identification of benefit received; then, the benefit from the satisfaction of LaRoue's debt would be assigned to the Debtor. Alternatively, it argues that the Debtor received "indirect benefit" from the transfer, as he had enjoyed the goods and services purchased through LaRoue's use of the Prime Option account in the first place.

Finally, the Defendant raises an affirmative defense: it was a good-faith transferee within the meaning of 11 U.S.C. § 550(b),[6] and as such is sheltered from liability. Terming LaRoue the "initial transferee" of the funds, the Defendant argues that it then received them from her in good faith and utterly without knowledge of the Debtor's financial affairs. This, it argues, entitles it to the shelter from liability given to a qualifying "immediate or mediate transferee" under the statute.

## II. Discussion

### A. Introduction

The governing law requires the issues to be segregated with some nuance. Analytically, the avoidability of a transfer at the instance of a trustee is the threshold issue; the issue of liability to the estate is separate, and second. H.R.REP. No. 595, 95th Cong. 1st Sess. 375 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 90 (1978). *See also Lippi v. City Bank,* 955 F.2d 599, 605 (9th Cir.1992); *In re Harbour,* 845 F.2d 1254, 1255 (4th Cir.1988). Thus, § 548(a)(2) must be applied to a transfer as *it was made from the debtor.* In cases that involve more than one transferee in a chain out from the debtor, the statutory concept of reasonably equivalent value requires the transferee(s) to be identified. This is a prerequisite to determining what the transferee from the debtor gave up in return for the value received, so the reasonable equivalence can be gauged.

"Transferee" is not a defined term under the Code, but "transfer" is, under 11 U.S.C. § 101(54).[7] *In re C–L Cartage Co., Inc.,* 899 F.2d 1490, 1494 (6th Cir.1990). Under that definition, an entity that receives "property or an interest in property" from a debtor, directly or indirectly, is a transferee. The framers of the Code anticipated the possibility that a fraudulent transfer be executed through a chain of such recipients, any or all

---

**6.** 11 U.S.C. § 550 opens with:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under [11 U.S.C. § ] 548 . . . , the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

The general allowance of recovery from all participants in a chain of transfers from a debtor under § 550(a) is limited by the following subsection:

> (b) The trustee may not recover under [11 U.S.C. § 550](a)(2) . . . from—
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.

**7.** In pertinent part, this provision defines "transfer" as:

> . . . every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property . . .

of which might be in collusion with the debtor. H.R.REP. No. 595, 95th Cong. 1st Sess. 375–376 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 90 (1978). In such a case, the status of each recipient as a transferee is fixed by whether it has received property rights that the debtor originally held. Then, the status of each as an "initial transferee," or as a "mediate or immediate transferee" via the initial transferee, is to be determined.

■ As a general rule, § 550(a) imposes liability on all recipients in a chain of transfers of fraudulently-conveyed property. *In re Sherman*, 67 F.3d 1348, 1356 (8th Cir. 1995). The difference in status between initial transferee and mediate/immediate transferee, however, qualifies this. An initial transferee from the debtor is strictly liable. *In re Bullion Reserve of North Am.*, 922 F.2d 544, 547 (9th Cir.1991); *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir.1988); *In re Moskowitz*, 85 B.R. 8, 10 (E.D.N.Y.1988); *In re Blinder, Robinson & Co., Inc.*, 162 B.R. 555, 562 (D.Colo.1994); *In re Dominion Corp.*, 199 B.R. 410, 413 (9th Cir. BAP 1996). Mediate or immediate transferees in the chain out from the initial transferee may avoid liability by proving something akin to bona fide purchaser status. *In re Coutee*, 984 F.2d 138, 140 n. 2 (5th Cir.1993); *In re Baker & Getty Financial Services, Inc.*, 974 F.2d 712, 722 (6th Cir.1992); *In re C–L Cartage Co., Inc.*, 899 F.2d at 1495; *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1201 (11th Cir.1988); *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d at 896 n. 3; *In re Presidential Corp.*, 180 B.R. 233, 236 (9th Cir. BAP 1995). *See, in general, discussion in In re Circuit Alliance, Inc.*, 228 B.R 225, 231–32 (Bankr.D.Minn. 1998).

### B. Section 548(a)(2): Avoidability of the Transfer.

As noted earlier, the avoidability of the Debtor's transfer of $2,726.42 is the threshold issue. The statute sets out three basic elements: the transfer of property (or an interest in property) of the debtor; the contemporaneous or resultant insolvency of the debtor; and the receipt by the debtor of less than reasonably equivalent value for the asset transferred.

### 1. Identity of Transferee(s), Event(s) of Transfer, and Asset Transferred.

■ The funds in question here followed a clear path; originating in the Debtor's lump-sum receipt, and hence his property at that point, they went into a joint bank account; then they went out of that account, at LaRoue's instance, to the Defendant. Because of the way in which the parties have framed their theories of recovery and defense, it is necessary to determine how many transfers this path included, between whom they ran, and of what they consisted.

The Plaintiff's tacit theory is that the transfer ran directly from the Debtor to the Defendant. At the Plaintiff's request, the Debtor testified that he never intended to "make a gift" of any of his separate income or monies to LaRoue. The Plaintiff then invoked MINN.STAT. § 524.6–203(a) [8] to argue that "99% of the funds in the account at the time the payment was made" *to the Defendant* was property of the Debtor.[9]

The problem with this theory is that it ignores several facts: the funds to make the payment passed through LaRoue's possession and control, via a check she issued and signed; they did so pursuant to a specific understanding between the Debtor and LaR-

---

**8.** This statute is part of the Minnesota enactment of the Uniform Probate Code. It provides:

> A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.

This provision is found among statutes regulating the probate process, but on its face it governs *inter vivos* property rights. The Minnesota statute appellate courts have consis-

tently applied it to do so. *Smith v. State*, 389 N.W.2d 543 (Minn.App.1986); *Carlson v. Carlson*, 363 N.W.2d 803 (Minn.App.1985); *Hefner v. Estate of Ingvoldson*, 346 N.W.2d 204 (Minn. App.1984).

**9.** The Plaintiff cited the figure of 99 percent in his brief without disclosing his method of calculation. In closing argument, he modified the figure to 96 percent, after recapitulating a process of calculation much the same as the one applied *infra* at pp. 776–777.

oue, as to the way in which they would jointly manage the financial affairs of their household; the underlying debt arose from joint activity of the Debtor, LaRoue and members of their household, in purchases of goods and services that they all enjoyed; and the Debtor always knew what LaRoue was doing with the proceeds of his lump-sum receipt, including their application to debts that she had separately contracted, and he never objected. For the Debtor to state that he and LaRoue intended to maintain separate ownership of all funds that passed through their joint account flies entirely in the face of their practice. For the Plaintiff to maintain an argument based on such an assumed and utterly strict separation of property rights just makes no sense.

Simply stated, the Debtor's conclusory statement is not credible. Arrayed against it is LaRoue's more detailed testimony. She offered a far more realistic picture of the intent of any couple involved in an informal cohabitation without benefit of wedlock: though both of them held credit card accounts in their individual names, she made the payments on those accounts out of the funds currently on deposit in the joint account, just as she paid household expenses, made purchases of clothing and necessities, and made homestead mortgage and car-loan payments. LaRoue's statement of their understanding was simple, but all-telling: both she and the Debtor deposited funds in the account as they received them; both wrote checks off it as needed; and neither kept a strict accounting for the deposit and application of monies that originated in either individual's own right.

LaRoue's evidence clearly and convincingly establishes their understanding as to the ownership of all funds placed into the TCF account: once deposited, funds came under the potential control of the other account holder; and in accordance with their living arrangement, once an individual determined to pay a debt from the commingled funds, the ownership of the funds so used then passed to the party making the withdrawal to the extent that that debt was the legal liability of the withdrawing party. Neither the Debtor nor LaRoue attested to an explicit grant of such authority to the other, but both acquiesced to repeated disbursements of his or her own funds on account of the debts of the other party. This happened without exception, and over the length of their cohabitation. If a legal label must be attached to the subject event, it was a gift: the funds subjected to the end-use had been delivered by deposit in the joint TCF account; the original owner and depositor intended to part with all claim to them to the extent they were used by the other party; and the donor ceded full control of them to the other party for the disbursement to third parties. *Smith v. State,* 389 N.W.2d at 545 (citing *Brennan v. Carroll,* 260 Minn. 521, 111 N.W.2d 229, 234 (Minn.1961)).[10]

The underlying evidence, and the inference thus made, rebut the statutory presumption of a continuing ownership structured by the original "net contributions." The implication is clear: as soon as LaRoue issued and tendered the check to the Defendant, the property rights in the underlying funds passed to her, to the extent that they had been derived from the Debtor's lump-sum receipt. Given the statutory presumption, the nominal control that LaRoue as a joint account holder exercised over all of the funds on deposit did not ripen to a full-blown property right until she wrote a check in payment on a household obligation. However, under her understanding with the Debtor it certainly did then. LaRoue became a transferee, and perforce the initial transferee.[11] Then, at least for analysis under § 550(a), she retained the funds until TCF honored the check. *Barnhill v. Johnson,* 503 U.S. 393, 400–401, 112 S.Ct. 1386, 1390–1391, 118 L.Ed.2d 39 (1992) (under Article 3 of Uniform Commercial

---

10. The Defendant's pitch for the deeming of an "identity of interests" between the Debtor and LaRoue has no merit. Such a melding of legal personality has not been applied to participants in a legal marriage for the better part of this century, and for many different reasons. There is far less cause to apply it to informal cohabi-
tants-who have deliberately forsworn formal duties of care and support.

11. TCF, of course, was a "mere conduit," and never became a transferee at all. *See* discussion in *In re Circuit Alliance, Inc.,* 228 B.R. at 232–34.

Code, transfer within meaning of 11 U.S.C. § 101(54), of funds that are subject of check, takes place when drawee bank accepts and pays check); *Olsen–Frankman Livestock Marketing Serv., Inc. v. Citizens Nat'l Bank,* 4 B.R. 809, 812–813 (D.Minn.1980); *In re Ramy Seed Co.,* 57 B.R. 425, 429 (Bankr. D.Minn.1985).

The next party in the chain of recipients, of course, was the Defendant. There is no question that the Defendant was a transferee; its receipt of property rights in the form of the funds from the TCF account is easily traced through a single transaction and in an intact form just as LaRoue passed it on. As a recipient from the initial transferee, though, and as the last in the chain presented by the evidence, the Defendant is an immediate transferee.

2. Contemporaneous Insolvency.

11 U.S.C. § 101(32)(A) [12] imposes a "balance sheet" test for insolvency. Without substantial controversy from the Defendant, the Plaintiff proved that the Debtor was insolvent on June 20, 1995, under it. [13] This satisfied the second element, under § 548(a)(2)(B)(i).

3. Lack of Reasonably Equivalent Value.

■ The third element, a lack of reasonably-equivalent value in what the Debtor received, is more involved. A payment made *solely* for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor. *In re Bargfrede,* 117 F.3d 1078, 1080 (8th Cir.1997) (citing *In re Jolly's,*

*Inc.,* 188 B.R. 832, 842 (Bankr.D.Minn.1995)). In cases where the immediate benefit from a transfer is identifiable to a non-debtor third party, the burden shifts to the transferee to show that the debtor received a cognizable indirect benefit. The indirect benefit must have been both tangible and of concrete economic value. *In re Minnesota Utility Contracting, Inc.,* 110 B.R. 414, 419–420 (D.Minn. 1990); *In re Jolly's, Inc.,* 188 B.R. at 842.

■ This is not an easy thing to prove, in the context of a personal relationship between a debtor and a beneficiary-third party. The easing of personal strain that had resulted from the existence of the debt, or the more general promotion of love, affection, or other personal tie, is too intangible for reasonable equivalence. *In re Bargfrede,* 117 F.3d at 1080. This rule was applied strictly against the defendant *In re Bargfrede,* where the relationship was a legal marriage with all of the duties of support and sustenance that it entails. If anything, it applies more strongly here, in a case of informal cohabitation without such legal duties. Thus, "reasonably equivalent value" for the transfer between the Debtor and LaRoue did not arise merely because the transfer occurred in the maintenance of their relationship.

■ The Defendant has not shown any indirect benefit to the Debtor of the sort contemplated by *Minnesota Utility Contracting,* either. The Defendant's insistence that the Debtor had received some economic benefit from the expenditures funded by its

**12.** This statute defines "insolvent" as:
... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation...
*See In re Bellanca Aircraft Corp.,* 56 B.R. 339, 385 (Bankr.D.Minn.1985) (quoting *American Nat'l Bank & Trust of Chicago v. Bone,* 333 F.2d 984, 989 (8th Cir.1964)). The adjudication on this issue is almost purely factual in nature. *In re Muncrief,* 900 F.2d 1220, 1224–1225 (8th Cir. 1990).

**13.** The Defendant's counsel did not raise any issue on the insolvency element in his brief. At trial he cross-examined the Debtor and got him to concede two things: LaRoue was jointly and severally liable on the debts secured by their homestead and van; and the Debtor had scheduled the balances of the debts in their full amounts and had claimed a right to only one-half

of the value of the pledged assets in his property schedules. The point of this questioning was somewhat obscure, but it apparently went to the insolvency element. Ultimately, it had no basis in law, because the asset side of the statute's balance sheet is to be calculated "exclusive of ... property that may be exempted from property of the [bankruptcy] estate ..." 11 U.S.C. § 101(32)(A)(ii). The Debtor claimed and was allowed his exemptions in his modest homestead equity and the bare title interest he held in the van. All of his few remaining assets were similarly exempt, leaving the asset side of the balance sheet at zero. The Debtor's two unsecured debts-the large one to the Fortis Company and the unsecured component of the debt for the financing for the van-rendered him insolvent under the statutory definition.

original extension of credit misses the point on this element; the inquiry on reasonable equivalence goes solely to the exchange that included the subject transfer. Here, that was the *satisfaction* of the debt, and not to any earlier transaction that may have created it. Because the Debtor was not liable on the debt, he received no direct or indirect benefit from its satisfaction.

The Debtor did not receive any value from the transfer of the funds to LaRoue that enabled her to pay her debt to the Defendant. The Plaintiff has satisfied the third element of § 548(a)(2)(A), and has proved up an avoidable fraudulent transfer.

### C. Section 550(a): Attachment of Liability; Parties Named and Not Named, and the Defendant's Affirmative Defense.

■ As noted earlier, § 550(a)(1) imposes strict liability on the initial transferee of property fraudulently or preferentially transferred by a debtor. Had the Plaintiff named LaRoue as a defendant, she would be subject to judgment without possibility of defense.

The Plaintiff did not. The Defendant was named, but as an immediate transferee it had the prospect of shelter under the good faith provisions of § 550(b). The Defendant pleaded and argued this position. However, it did not produce a shred of its own evidence going to the central fact question under § 550(b): whether it, through its employees or agents, was on notice of any circumstance that would have led a reasonable person to suspect a fraudulent transfer of the Debtor's property. *In re Sherman*, 67 F.3d at 1357.

Section 550(b) affords an affirmative defense. As the proponent of the defense, the Defendant had the burden to produce evidence to satisfy all of its elements. *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir.1988); *In re Food & Fibre Protection, Ltd.*, 168 B.R. 408, 422 (D.Ariz.1994). The Defendant did not carry that burden; it did not produce an employee or agent to deny the knowledge or notice contemplated by *Sherman*.[14] Because the Defendant did not prove up its affirmative defense, the general rule of § 550 applies. As an immediate transferee, the Defendant is subject to judgment to effectuate the avoidance of the transfer of the Debtor's property that enabled LaRoue to pay her debt to the Defendant.

### D. Amount of Judgment

■ At this point MINN.STAT. § 524.6–203(a) applies, to determine the amount of the fraudulent transfer that LaRoue received from the Debtor, and then passed on to the Defendant. At trial, the Plaintiff as much as conceded that the $1,486.06 balance on June 12, 1995, was entirely LaRoue's property under the net-contribution rule of the statute.[15] He then submitted that the balance in the account after the Debtor's two deposits of June 12 could be attributed proportionately to the ownership of the Debtor and LaRoue, using the net-contributions rule. Finally, he conceded that the resulting ratio could be applied to the subjects of all transactions on the account up to and including the tender of the check to the Defendant.

In the absence of any other method of attribution[16], this one will be applied—even

---

**14.** The only statement by the Defendant, or on its behalf, that appears in the record, is Plaintiff's Exhibit 2. This is a November 9, 1995 letter from Pamela Morgan, the Defendant's "Bankruptcy Representative," rejecting the Plaintiff's pre-suit demand on the ground that "[the] check was written on a joint account that shows our cardholder as a cosigner." Standing alone, the content of this statement has little or no relevance to the defense, as framed by *Sherman*. In any event, it was not proffered by the Defendant, and was not expanded by the proffer of any in-court testimony by the declarant or anyone else. It certainly does not "prove the negative" that the *Sherman* test requires.

**15.** This was not all that generous; the evidence suggested that the Debtor had had precious little

income for some time before he received the lump sum.

**16.** The Plaintiff's concession makes it unnecessary to face a difficult question in this adversary proceeding. MINN.STAT. § 524.6–203(a) applies much more readily and predictably to bank accounts that maintain static balances, or as to which there is clear documentary linkage of withdrawal to deposit or depositor. Its application is more problematic as to accounts for which there is a high volume of deposits and withdrawals, especially by more than one holder; in such an instance, it does not specify a method for tracing the exhaustion or abatement of individual holders' deposits, or even whether such a process should be imposed. The possible rules

though it is used to fix the amount of the transfer at a beginning point between the Debtor and LaRoue, rather than as the Plaintiff envisioned. The sum of LaRoue's pre-existing funds and the Debtor's deposits is $32,070.06, of which almost exactly 95 percent was attributable to the Debtor's deposits. Of the funds used to pay the Defendant, then, $2,590.01 came from the Debtor's original property rights. That is the amount of the fraudulent transfer made to LaRoue, and thence to the Defendant.

## CONCLUSION

The Defendant was an immediate transferee of an avoidable fraudulent transfer from the Debtor, in the sum of $2,590.01. The Defendant did not demonstrate that it received that transfer in good faith and without knowledge of its avoidability under the law. Thus, the Defendant is liable to the bankruptcy estate in effectuation of the avoidance.

## ORDER FOR JUDGMENT

Upon the memorandum of decision just made,

IT IS ORDERED, ADJUDGED, AND DECREED:

1. The transfer of funds from the Debtor to the Defendant on June 21, 1995, through the tender and honoring of a check by Kim LaRoue, was a fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(2), and is avoided.

2. Pursuant to 11 U.S.C. § 551, the transfer so avoided is preserved for the benefit of the Debtor's bankruptcy estate.

3. Pursuant to 11 U.S.C. § 550(a)(2), the Plaintiff shall recover from the Defendant, as the immediate transferee of the transfer so avoided, the sum of $2,590.01.

LET JUDGMENT BE ENTERED ACCORDINGLY.

for application are several: they include the first-in, first-out rule of thumb from accounting; a tracing process turning on the benefit derived from a withdrawal, or the contractual liability prompting it; or the fixing of a cut-off point in time, arbitrarily or not, with the application of a ratio thereafter. The Plaintiff acquiesced to applying the last method here.