United States Court of Appeals
Fifth Circuit

**F I L E D**

May 18, 2007

Charles R. Fulbruge III
Clerk

REVISED May 31, 2007

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 05-10597
consolidated with
No. 05-11484
_____

SECURITIES AND EXCHANGE COMMISSION; ET AL.,

Plaintiffs,

LAWRENCE J. WARFIELD, as Receiver for International Education
Research Corporation,

Plaintiff-Appellee,

versus

RESOURCE DEVELOPMENT INTERNATIONAL LLC; ET AL.,

Defendants,

M&M ENGRAVING AND MANUFACTURING CO.; ANTHONY MARTELLA,

Defendants-Appellants.
_____

Appeal from the United States District Court
for the Northern District of Texas, Dallas
_____

Before JONES, Chief Judge, and JOLLY and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

After Benjamin Cook's ("Cook") assets were frozen in
conjunction with a pending lawsuit by the Securities and Exchange
Commission, Anthony Martella ("Martella") agreed with Cook to pay
Cook's lawyers $60,000 from his company's corporate account in
exchange for immediate reimbursement arranged by Cook. Immediately

after completing the payments to Cook's lawyers, Martella's company, M&M Engraving and Manufacturing Co. ("M&M"), received a wire transfer from International Education Research Corporation ("IERC") for the identical amount. IERC was subsequently placed in receivership. The receiver, Warfield, sued Martella and M&M seeking return of the $60,000 payment that M&M had received from IREC on a theory of fraudulent transfer. After a bench trial, the district court concluded that the $60,000 payment was a fraudulent transfer and found Martella and M&M jointly and severally liable for its repayment. The district court declared that the judgment would be nondischargeable in bankruptcy.

On appeal Martella and M&M (collectively "the Defendants") challenge the district court's holdings as to liability and nondischargeability. The receiver concedes that the district court's ruling on nondischargeability in bankruptcy was premature and we agree. Finding no merit to the Defendants' other arguments, we AFFIRM the monetary judgment and VACATE the order declaring nondischargeability of the judgment in bankruptcy.

I.

This appeal is an appendage of two lawsuits filed by the Securities and Exchange Commission ("SEC") to shut down two fraudulent prime bank trading programs. In March 1999, the SEC initiated a lawsuit ("SEC v. Cook") alleging that Cook and several other defendants were engaged in a complex Ponzi scheme (the "Dennel Program"). In the backdrop to this particular lawsuit, the

district court issued a Receivership Order designed to protect any remaining assets to reimburse the investors defrauded by the Dennel Program. The court appointed Lawrence J. Warfield ("Warfield") as receiver. The court also issued a temporary restraining order that prohibited Cook or any person or entity cooperating with him from

> directly or indirectly, making any payment or expenditure of funds, incurring any additional liability (including, specifically, any advances on any line of credit), or effecting any sale, gift, hypothecation or other disposition of any asset, pending defendants providing sufficient proof to the Court that they have sufficient funds or assets to satisfy all claims arising from the violations of the federal securities laws alleged in the SEC's complaint.

The court subsequently entered a preliminary injunction with the same terms.

Martella is the sole shareholder and sole director of M&M. Martella is also a long-time friend and business associate of Cook. M&M had invested more than $600,000 with the Dennel Program directly, and about $237,000 with the Dennel Program through its pension plan. After his assets and those under his control were frozen, Cook was unable to pay his attorneys. Cook asked Martella to pay his attorneys in exchange for immediate reimbursement. On March 31, 1999 and April 8, 1999, Martella personally delivered two checks, in the amounts of $10,000 and $50,000, to Cook's attorneys. These checks were drawn on M&M's Chase Bank checking account. On April 9, 1999, IERC wired $60,000 from its U.S. Bank of Nevada account to M&M. At the time the $50,000 check was issued to Cook's

3

attorneys, M&M's checking account would not have contained sufficient funds to pay it, but for the wire transfer from IERC.

In March 2002, the SEC filed a second lawsuit ("SEC v. RDI") against another set of defendants led by James and David Edwards. The defendants in this lawsuit included IERC, Resource Development Institute, LLC, ("RDI"), and other entities. The complaint alleged that the RDI prime bank trading program ("RDI Program") had its genesis in the Dennel Program, and that James and David Edwards, and their co-defendants, had developed the RDI Program to replace the Dennel Program after the SEC shut it down. The district court also entered a Receivership Order with respect to these defendants and again appointed Warfield as receiver.

After discovering the 1999 wire transfer from IERC to M&M, Warfield filed suit on December 20, 2002, claiming that the transfer of funds from IERC to M&M was fraudulent under the Uniform Fraudulent Transfer Act. Warfield also contended that Martella and M&M's failure to return the funds to him constituted wrongful conversion. Finally, Warfield alleged that Martella and M&M conspired with Cook and the Edwards Defendants to defraud the IERC, the Receivership Entities, and their investors. Warfield requested equitable disgorgement to prevent Martella and M&M from being unjustly enriched by their fraudulent acts -- and joint and several liability as between the two defendants on the theory that Martella used M&M to perpetrate fraud and that the court should hold him personally accountable.

4

The case was tried before the district court beginning on January 10, 2005. On January 26, 2005, the district court entered its findings of facts and conclusions of law. The court found that Martella, knowing that Cook's accounts were frozen, agreed to make payments to Cook's counsel in exchange for immediate reimbursement. After Martella delivered two checks to Cook's lawyers, this transaction was completed when he was reimbursed by a wire transfer from IERC. Martella and M&M were aware or reasonably should have been aware of the court's order freezing Cook's assets and restricting the disposition of assets within his control.

In the same order, the court determined that: IERC was an entity created to perpetuate an illegal Ponzi scheme; all of its assets resulted from fraudulent activities; on April 9, 1999, when IERC transferred $60,000 to defendant M&M, IERC was insolvent; M&M gave no reasonably equivalent value to IERC for the $60,000 transfer; IERC made the transfer and M&M received the monies to hinder enforcement of the Court's orders freezing Cook's accounts and restricting the disposition of his assets, and to further perpetuate the fraud on Dennel's investors; and in using M&M for this money laundering transaction, Martella utilized his control over the corporation for an illegal purpose (violation of the court's orders) and to continue the fraudulent Dennel Program.[1]

[1] Although fraud is more commonly "perpetrated" than "perpetuated," in this case, the district court specifically found that the IERC was created to perpetuate the fraudulent Ponzi scheme after the SEC shut down its predecessor, the Dennel Trading

On the basis of these findings, the district court concluded that: IERC's April 9, 1999 wire transfer of $60,000 to defendant M&M was a fraudulent transfer under § 24.005(a)(1) of the Texas Business and Commerce Code; the $60,000 payment constituted an unjust enrichment that the Defendants should be required to disgorge; and M&M was the alter ego of Martella, with respect to the $60,000 payment. Finally, the court rejected the Defendants' asserted affirmative defenses of offset, "good faith," waiver, and laches.

The district court entered a final judgment granting Warfield joint and seyveral recovery from M&M and Martella in the amount of $60,000 plus pre-judgment interest and costs. The court also declared that the judgment against the Defendants could not be discharged in bankruptcy.[2] The Defendants filed a Motion for New Trial on February 3, 2005, which the court denied on April 4, 2005. The Defendants timely appealed the Judgment and the denial of the Motion for New Trial.[3]

II.

Program.

[2] The final judgment was entered on January 24, 2005, two days prior to the findings of fact and conclusions of law.

[3] On November 8, 2005, while this appeal was pending, the Defendants filed a Motion for Relief From Judgment under Federal Rule of Civil Procedure 60, claiming that the $60,000 RDI Receivership claim should be set off against $167,543.00 that M&M reinvested with the Rivera Breach Trust 410, which they alleged was another RDI receivership entity. The district court denied this motion and Defendants have appealed. This appeal is not before us.

On appeal, the Defendants argue that the district court erred in finding that the wire transfer of $60,000 constituted a fraudulent transfer under § 24.005(a)(1). The Defendants also contend that the district court erred in finding that the $60,000 payment constituted an unjust enrichment, and in holding that Martella could be held jointly and severally liable with M&M under the alter ego theory of liability. In the alternative, the Defendants argue that the court erred in denying their good faith defense. Finally, the Defendants argue that the District Court erred in holding that the final judgment may not be discharged in bankruptcy.

A.

We first consider whether the district court erred in finding that the payment constituted a fraudulent transfer under the Texas Business and Commerce Code, § 24.005(a)(1). The Uniform Fraudulent Transfer Act as adopted by Texas provides that:

> A transfer ... incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, ... if the debtor made a transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably believed that the debtor would incur, debts

7

> beyond the debtor's ability to pay as they became due.

TEX. BUS. & COMM. CODE ANN. § 24.005(a). The district court explicitly held that the transfer was fraudulent under § 24.005(a)(1), as a transfer made "with actual intent to hinder, delay, or defraud any creditor of the debtor."[4] The district court's underlying findings of fact will be upheld unless they are clearly erroneous, while its legal conclusions are reviewed <u>de novo</u>. <u>Chandler v. City of Dallas</u>, 958 F.2d 85, 89 (5th Cir. 2002).

The Defendants argue that the district court's determination that the $60,000 transfer was fraudulent under § 24.005(a)(1) was erroneous because Warfield provided no evidence to support a finding of actual intent on the part of the Defendants. Contrary to the Defendants' assertions, however, "the transferees' knowing participation is irrelevant under the statute" for purposes of establishing the premise of (as opposed to liability for) a fraudulent transfer. <u>Warfield v. Byron</u>, 436 F.3d 551, 559 (5th Cir. 2006) (Jones, C.J.).[5] The statute requires only a finding of

---

[4] It appears that the district court also intended to hold that the transfer was fraudulent under § 24.005(a)(2), but due to an apparent scrivener's error failed to do so. The first two conclusions of law in the district court's opinion are identical. This court can, in any event, uphold the judgment on any basis supported by the record. <u>Zuspann v. Brown</u>, 60 F.3d 1156, 1160 (5th Cir. 1995).

[5] In <u>Byron</u>, the court was reviewing Washington State law. 436 F.3d at 557. However, the relevant language of the provision analyzed is identical to that in this case. It provides:

> (a) A transfer made or obligation incurred by

8

fraudulent intent on the part of the "debtor," which in this case is IERC. The district court made a finding, which the Defendants do not contest, that IERC was part of a Ponzi scheme at the time this transfer was made. In this circuit, proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made. Id. at 558. Therefore, under our precedent, the district court did not err in holding that the transfer was fraudulent under § 24.005(a)(1).

Additionally, the record demonstrates that the $60,000 transfer from IERC to the Defendants was fraudulent under § 24.005(a)(2). The district court found that IERC was insolvent on April 9, 1999 when it made the transfer and that M&M gave no reasonably equivalent value to IERC in return for the $60,000. Based on these two findings, the transfer qualifies as fraudulent under § 24.005(a)(2). The Defendants do not challenge the finding of insolvency, but they do contest the district court's conclusion that no value was given to IERC in exchange for the payment.[6]

---

> a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

WASH. REV. CODE § 19.40.041(a)(1).

[6] This court reviews de novo "the issue whether a debtor received reasonably equivalent value." Matter of Fairchild Aircraft Corp., 6 F.3d 1119, 1125 (5th Cir. 1993).

The Defendants argue that IERC received value in exchange for its $60,000 transfer to M&M because the Defendants made a payment of the same amount to Cook's lawyers for legal fees. "The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." Byron, 437 F.3d at 560 (citing Butler Aviation Int'l v. Whyte, 6 F.3d 1119, 1127 (5th Cir. 1993)). According to the commentary to the Uniform Fraudulent Transfer Act ("UFTA"), "value is to be determined in light of the act's purpose, in order to protect the creditors." In re Agric. Res. & Tech. Group, Inc., 916 F.2d 528, 540 (9th Cir. 1990). "Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition." UNIF. FRAUDULENT TRANSFER ACT § 3 cmt. 2. (1984). Here, IERC's net worth was diminished by the $60,000 payment to M&M and its defrauded creditors received no benefit from funding the legal defense of one of the major organizers of this fraudulent scheme. The district court was therefore correct in concluding that IERC did not receive reasonably equivalent value for its $60,000 transfer to M&M. See In re Whaley, 229 B.R. 767, 775 (Bankr. Minn. 1999) ("A payment made solely for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor.") (citing In re Bargfrede, 117 F.3d 1078, 1080 (8th Cir. 1997)).

The record therefore supports the finding that the $60,000 transfer from IERC to M&M was fraudulent under both §§ 24.005(a)(1)

10

and 24.005(a)(2). Because the transfer was fraudulent under both sections, the district court correctly rejected the Defendants' good faith defense. As we explained in Byron, a defendant may prevent recovery of the transferred assets by proving that the transfers were received in good faith and in exchange for reasonably equivalent value. Byron, 436 F.3d at 558. The good faith defense fails here because the Defendants cannot show that they exchanged reasonably equivalent value for the $60,000 wire transfer.[7]

## B.

We now turn to address whether the district court erred in holding Martella, the sole director and sole shareholder of M&M, jointly and severally liable for the fraudulent conduct of M&M. The Defendants argue that the district court's finding that M&M was the alter ego of Martella for the purposes of the $60,000 transfer was erroneous -- and therefore that the court had no basis to hold Martella jointly and severally liable. Under Texas law, "[a]lter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex. 1986) (citing

---

[7] Defendants also argue that the district court erred in holding that IERC's wire transfer to M&M constituted unjust enrichment. Because we find that the wire transfer was fraudulent under § 24.005, we need not reach the question of whether M&M was unjustly enriched.

11

First Nat. Bank in Canyon v. Gamble, 134 Tex. 112 (1939)).  Alter
ego

> is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

Id.  The Defendants correctly point out that the district court made no findings with respect to these factors.

Alter ego is not however, the only basis for piercing the corporate veil, although many cases "have blurred the distinction between alter ego and the other bases for disregarding the corporate fiction and treated alter ego as a synonym for the entire doctrine of disregarding the corporate fiction."  Id.  There are "three broad theories of corporate disregard" under Texas law. Fidelity & Deposit Co. of Maryland v. Com. Casualty Consultants, Inc., 976 F.2d 272, 274 (5th Cir. 1992).  "The corporate veil is pierced when:  (1) the corporation is the alter ego of its owners or shareholders;  (2) the corporation is used for an illegal purpose, and (3) the corporation is used as a sham to perpetrate a fraud."  Id. at 274-75 (citations omitted).  Although the district court relied solely on its unsupported finding that M&M was the alter ego of Martella to justify the piercing of the corporate veil, "[w]e will not reverse a judgment if the district court can be affirmed on any ground, regardless of whether the district court

12

articulated the ground." <u>Harris v. United States</u>, 35 Fed. Appx. 390 at *1 (5th Cir. 2002) (unpublished) (citing <u>United Indus., Inc. v. Simon-Hartley, Ltd.</u>, 91 F.3d 762, 765 n.6 (5th Cir. 1996)).

The district court made explicit factual findings that "[w]ith regard to transferring $60,000 to Mr. Cook's attorneys on March 31, 1999 and April 8, 1999, and receiving $60,000 from IERC on April 9, 1999, defendant Martella utilized his control over defendant corporation M&M for an illegal purpose (violation of the Court's orders) and to perpetuate a fraud (the Dennel Trading Program)." We review the district court's factual findings for clear error, FED R. CIV. P. 52(a), and will not overturn them unless we are left with "the definite and firm conviction that a mistake has been committed." <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 573 (1985) (internal quotation marks and citation omitted).

We conclude that there is ample evidence to support the district court's finding that Martella used M&M for an illegal purpose, and on this basis we can uphold the court's conclusion that the corporate veil may be pierced in this case. Martella testified at trial that he was aware of the SEC lawsuit against Cook and of the order freezing Cook's assets, and that he was concerned about the impact of this lawsuit on M&M's investment in the Dennel Trading Program, which was determined to be a Ponzi scheme. He further testified that he was aware that Cook was trying to work with his attorneys to unfreeze the assets, but that Cook was unable to pay the retainer his attorneys required.

13

Martella admitted to having a conversation with Cook in which Cook asked him to advance the funds to the attorneys in exchange for immediate reimbursement. He confirmed that he personally delivered two checks to Cook's lawyers, totaling $60,000, and that he gave Cook an account number to effectuate the wire transfer. Martella also confirmed that there were insufficient funds in M&M's bank account to cover the $60,000 at the time that the wire transfer payment was received. Based on these facts, the district court's finding that Martella used M&M to help Cook circumvent the Receivership Order and to perpetuate the Ponzi scheme after the Dennel Trading Program was shut down was not clearly erroneous. We therefore conclude that the district court did not err in finding that M&M was used for an illegal purpose and we uphold the piercing of the corporate veil solely on that basis.

## C.

Finally, the Defendants challenge the district court's determination that the judgment may not be discharged in bankruptcy. The Defendants argue that this issue is not yet ripe for adjudication as they have not filed for bankruptcy, nor sought to have the judgment set aside in bankruptcy. Warfield concurs that this determination was premature, and we agree.

## III.

For the foregoing reasons, we AFFIRM the judgment as to Martella and M&M, VACATE the judgment as to nondischargeability and

14

REMAND for such further proceedings as the district court may deem necessary.[8]

AFFIRMED in part, VACATED in part, and REMANDED.

---

[8] The Defendants also appeal a Garnishment Judgment entered by the district court on November 4, 2005. Because the Defendants' only challenge to the garnishment is that the underlying judgment is invalid, our affirmance of the district court on the Defendants' liability for the fraudulent conveyance leads us to hereby AFFIRM the garnishment judgment as well.