WILLIAM P. MILLER, AS RECEIVER FOR ROSE FURNITURE COMPANY, PLAINTIFF V. FIRST BANK AND E. F. MERRELL COMPANY, L.L.C., DEFENDANTS

FIRST BANK, THIRD-PARTY PLAINTIFF V. ROBERT L. KESTER, WILLIAM V. KESTER, JR. AND EDGAR F. MERRELL, THIRD-PARTY DEFENDANTS

No. COA09-607

(Filed 3 August 2010)

**Fraud— fraudulent payments—loan to third parties**

The trial court did not err by entering summary judgment for First Bank on a claim by a receiver for constructive fraudulent payments where E.F. Merrell borrowed money for its furniture business, the loans were made to individuals, the payments were made by E.F. Merrell, the business of E.F. Merrell declined and funds were transferred from Rose Furniture so that E.F. Merrell could make the payments, and some of the individuals eventually finished making the payments.

**MILLER v. FIRST BANK**

[206 N.C. App. 166 (2010)]

Appeal by plaintiff from order entered 2 March 2009 by Judge Cressie Thigpen, Jr. in Guilford County Superior Court. Heard in the Court of Appeals 4 November 2009.

*Roberson Haworth & Reese, P.L.L.C., by James C. Lanik and Christopher C. Finan, for plaintiff-appellant.*

*Smith Moore Leatherwood LLP, by Bruce P. Ashley and Patrick M. Kane, for defendant-appellee First Bank.*

GEER, Judge.

William P. Miller, as the Receiver for Rose Furniture Company ("Rose Furniture"), filed this action seeking to void payments made by E. F. Merrell Company, L.L.C. ("E. F. Merrell")—with money received from Rose Furniture—to First Bank to reduce the debt on a loan made by First Bank to the third-party defendants, Robert L. Kester, William V. Kester, Jr., and Edgar F. Merrell. The Receiver contends that the E. F. Merrell payments were constructively fraudulent under the Uniform Fraudulent Transfer Act, N.C. Gen. Stat. §§ 39-23.1 through 39-23.12 (2009) ("UFTA"). We hold that the payments made by E. F. Merrell to First Bank were in exchange for reasonably equivalent value given that the proceeds of the loan had been used solely by E. F. Merrell. Therefore, the payments were not constructively fraudulent, and we affirm the trial court's grant of summary judgment in First Bank's favor.

## Facts

E. F. Merrell is a limited liability company established by Robert Kester, his brother William Kester, Jr., and Edgar Merrell. The Kesters and Edgar Merrell are the only current members of E. F. Merrell. Eileen Addis was originally a member of E. F. Merrell, but she withdrew from the company in 2002. E. F. Merrell began operating on 14 February 1996. The purpose of the company was to engage in a high end retail furniture business that would supplement the business of Rose Furniture. Rose Furniture has never been a member of E. F. Merrell, but Robert Kester has at all relevant times been an officer of Rose Furniture.

In 1998, E. F. Merrell was solicited by a local director of First Bank to move its banking business from High Point Bank to First Bank. That year, First Bank made a loan of $1,500,000.00 ("the 1998 loan") to the Kesters and Edgar Merrell as individuals. Joseph Youngblood, Senior Vice President/Area Executive for First Bank,

MILLER v. FIRST BANK

[206 N.C. App. 166 (2010)]

submitted an affidavit stating that although the 1998 loan was intended for use in E. F. Merrell's business, the Kesters and Edgar Merrell obtained the loan in their individual names for tax reasons. Robert Kester, on the other hand, submitted an affidavit stating that the three men intended that the loan would be made to E. F. Merrell with them as guarantors.

As part of the loan process, First Bank required that E. F. Merrell open bank accounts with First Bank, which E. F. Merrell did in 1998. All of the proceeds from the 1998 loan were deposited on 2 September 1998 directly into E. F. Merrell's money market account with First Bank. Most of the loan proceeds ($1,272,700.91) were used to pay off an existing loan to E. F. Merrell from High Point Bank. The rest of the funds were used by E. F. Merrell in its business operations.

E. F. Merrell made the regularly scheduled monthly payments on the 1998 loan beginning in October 1998 and continuing through February 2000. Robert Kester stated in his affidavit that E. F. Merrell made the payments because "the purpose of the loan was for use in E.F. Merrell's business; the proceeds from the loan were, in fact, used by E.F. Merrell to pay off its existing loan from High Point Bank and Trust; E.F. Merrell received the benefit of the loan, and we thought the loan had been made to E.F. Merrell, as borrower." Joseph Youngblood also stated in his affidavit that First Bank expected E. F. Merrell to make the payments because "the loan funds went to E. F. Merrell and were supposed to be used for E. F. Merrell's business activities."

In February 2000, First Bank made another loan in the amount of $1,566,869.00 ("the 2000 loan") for E. F. Merrell to use in its business. While Robert Kester again believed the loan was being made to E. F. Merrell with his brother, Edgar Merrell, and him as guarantors, Joseph Youngblood said the loan was made to the three men individually. Eileen Addis was also named as a borrower on the 2000 loan. First Bank issued three checks to fund this loan. Two of these checks, totaling $1,364,577.27, were used to pay off the 1998 loan from First Bank. The third check, in the amount of $202,291.73, was deposited in E. F. Merrell's operating account with First Bank on 29 February 2000.

As with the 1998 loan, E. F. Merrell made the regularly scheduled monthly payments to First Bank on the 2000 loan. According to Joseph Youngblood, First Bank expected E. F. Merrell to make these payments "since the purpose of the February 2000 loan was for E. F. Merrell's use in its business activities." Robert Kester stated that E. F.

Merrell, on its tax returns and other financial statements, treated both loans and the obligation to repay those loans as if the loans had been made to E. F. Merrell.

The 2000 loan was modified in February 2002 to remove Eileen Addis from the 2000 note when she left the company. In December 2002, the third party defendants renegotiated the 2000 note. Neither of these modifications led to any additional money being loaned, and they did not alter the amount of monthly payments on the 2000 loan.

A forensic accounting investigation of E. F. Merrell's books found that by 2002, E. F. Merrell was "losing money hand over fist" and missing inventory. Russell Taylor, the Controller of Rose Furniture, testified that in 2002 or 2003, the South Carolina operation of E. F. Merrell was shut down, but because there were monetary and tax incentives to keep the company alive, E. F. Merrell began operating out of the same store as Rose Furniture Clearance, a subsidiary of Rose Furniture. Some sales were allocated to E. F. Merrell and some were allocated to Rose Furniture Clearance, but all of the furniture sold belonged to Rose Furniture Clearance. At this time, E. F. Merrell owed money to both Rose Furniture and Rose Furniture Clearance.

During this period, the regularly scheduled payments on the 2000 loan in the amount of $19,630.78 remained unchanged and continued to be made by E. F. Merrell. Beginning in 2003, Rose Furniture started transferring funds to E. F. Merrell on a monthly basis. Each of those transfers to E. F. Merrell occurred just before E. F. Merrell made the monthly payments to First Bank. Rose Furniture made the transfers to E. F. Merrell so that E. F. Merrell could make the loan payment to First Bank since E. F. Merrell did not have the funds available to make the payments. This process continued until December 2006. In 2007, the Kesters individually began making the remaining payments on the loan. As of November 2007, the loan balance had been reduced to zero.

William Miller was subsequently appointed as the Receiver for Rose Furniture in separate litigation. The Receiver filed suit against First Bank and E. F. Merrell on 29 May 2008, alleging fraudulent transfers, constructive trust, and unjust enrichment. On 28 July 2008, defendants filed an answer and asserted third party claims against the Kesters and Edgar Merrell that are unrelated to this appeal.

On 20 January 2009, First Bank moved for summary judgment, and on 30 January 2009, the Receiver cross-moved for summary judg-

ment. On 2 February 2009, the Receiver dismissed all claims against E. F. Merrell and dismissed all claims against First Bank except for the claim for fraudulent transfers. On 2 March 2009, the trial court denied the Receiver's motion for summary judgment and granted First Bank's motion for summary judgment. The Receiver timely appealed to this Court.

## Discussion

The sole issue raised by this appeal is whether the trial court erred in granting summary judgment to First Bank on the Receiver's claim for fraudulent transfers under the UFTA. "On appeal, an order allowing summary judgment is reviewed *de novo.*" *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004). The Court must determine " '(1) whether there is a genuine issue of material fact and (2) whether the movant is entitled to judgment as a matter of law.' " *McCoy v. Coker*, 174 N.C. App. 311, 313, 620 S.E.2d 691, 693 (2005) (quoting *NationsBank v. Parker*, 140 N.C. App. 106, 109, 535 S.E.2d 597, 599 (2000)).

N.C. Gen. Stat. § 39-23.5(a), part of the UFTA, provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation *without receiving a reasonably equivalent value in exchange for the transfer* or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(Emphasis added.) Pursuant to N.C. Gen. Stat. § 39-23.7(a)(1), a creditor who establishes the existence of a fraudulent transfer may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim[.]" Further, "the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less." N.C. Gen. Stat. § 39-23.8(b). There is no claim of actual fraud in this case, only an allegation of constructive fraud.

In order to establish that the transfers made from E. F. Merrell to First Bank were constructively fraudulent, the Receiver must show that (1) its claim arose before the transfers were made, (2) E. F. Merrell made the transfers without receiving a reasonably equivalent value in exchange, and (3) E. F. Merrell was insolvent at the time. The parties only dispute the second of these requirements: whether E. F.

Merrell received reasonably equivalent value in exchange for the transfers. The Receiver argues that because E. F. Merrell was making payments to First Bank to reduce the debt on the loan from First Bank to the Kester brothers and Edgar Merrell, E. F. Merrell did not receive reasonably equivalent value in return for those payments.

Although the North Carolina courts have not yet addressed this issue, the Official Comments to the UFTA provide some initial guidance as to the intent of the General Assembly. "[T]he commentary to a statutory provision can be helpful in some cases in discerning legislative intent." *Parsons v. Jefferson-Pilot Corp.*, 333 N.C. 420, 425, 426 S.E.2d 685, 689 (1993). Here, although the Official Comments to the UFTA were not enacted into law, they were included with the printing of the statute and are, therefore, relevant in construing the intent of the statute. *See also Rentenbach Constructors, Inc. v. CM P'ship*, 181 N.C. App. 268, 271, 639 S.E.2d 16, 18 (2007) (holding that although Official Comment to section of Uniform Commercial Code was not binding because it was not enacted into law, it could be used to ascertain legislative intent since it was printed with statute).

The Official Comment included with N.C. Gen. Stat. § 39-23.6 provides:

> The debtor may receive reasonably equivalent value in exchange for an obligation incurred even though the benefit to the debtor is indirect. *See Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d [979, 991-92 (2d Cir. 1981)]. . . .

Because *Rubin* is cited in the Official Comment to § 39-23.6, we use it as the starting point for our analysis.

In *Rubin*, 661 F.2d at 991, the Second Circuit, in addressing fraudulent conveyances under § 67(d) of the Bankruptcy Act, explained the indirect benefit rule referenced in the Official Comment to N.C. Gen. Stat. § 32-23.6. Under § 67(d), even if a debtor transferred property or incurred an obligation within one year of filing for bankruptcy, the trustee could not set aside the transaction if the debtor received "fair" consideration for his property or obligation. 661 F.2d at 991. Consideration was considered "fair" " '(1) when, in good faith, in exchange and as a fair equivalent therefor, property [was] transferred or an antecedent debt [was] satisfied, or (2) when such property or obligation [was] received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.' " *Id.* (quoting 11 U.S.C. § 107(d)(1)(e)).

**MILLER v. FIRST BANK**

[206 N.C. App. 166 (2010)]

The Second Circuit recognized that "special difficulties" are presented when, as in this case, the transaction is "[t]hree-sided." *Id.* The Court explained:

> On its face, the statute appears to sanction, as supported by "fair" consideration, a transaction in which the debtor transfers property or incurs an obligation as security for the debt of a third person, provided that the debt is "not disproportionately small" in comparison to that property or obligation. Nonetheless, if the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation. Accordingly, courts have long recognized that "[t]ransfers made to benefit third parties are clearly not made for a 'fair' consideration," and, similarly, that "a conveyance by a corporation for the benefit of an affiliate [should not] be regarded as given for fair consideration as to the creditors of the conveying corporations."

*Id.* (quoting 4 Collier on Bankruptcy ¶ 67.33 at 514.1-14.2 (14th ed. 1978)).

On the other hand, the Court continued:

> The cases recognize . . . that a debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person. As we have recently stated, although "transfers *solely* for the benefit of third parties do not furnish fair consideration" under § 67(d)(1)(e), the transaction's benefit to the debtor "need not be direct; it may come indirectly through benefit to a third person."

*Id.* (quoting *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979)). The Court reasoned:

> If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and § 67(d) has been satisfied—provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.

*Id.* at 991-92.

MILLER v. FIRST BANK

[206 N.C. App. 166 (2010)]

The Court then cited as examples cases in which "fair considera-tion [was] found for an individual debtor's repayment of loans made to a corporation, where the corporation had served merely as a con-duit for transferring the loan proceeds to him." *Id.* at 992. It also dis-cussed cases holding that fair consideration existed "where the debtor's discharge of a third person's debt also discharges his own debt to that third person," as well as in "multi-party transactions of greater intricacy. . . ." *Id.* The Court explained that "[i]n each of these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred." *Id.*

The Fourth Circuit applied the indirect benefit rule in *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 485 (4th Cir. 1992), holding that a company received reasonably equivalent value when the company received the proceeds of a loan made in the name of the owner of the company, but the company repaid the loan directly. In *Bigelow*, the First American Bank of Maryland issued a line of credit to Donatelli & Klein, Inc., which owned 50% of the stock of the debtor company. *Id.* at 480-81. Although Donatelli & Klein was the maker of· the line of credit, only the debtor company received the draws on the line of credit (ultimately amounting to $1,000,000.00), and all pay-ments were made directly by the debtor company to First American. *Id.* at 481. The debtor company executed a note for $1,000,000.00 to Donatelli & Klein in the same amount as the line of credit and with the same terms as the line of credit. *Id.* As the debtor company made direct payments to First American, its liability on the note to Donatelli & Klein decreased. *Id.*

Subsequently, however, Donatelli & Klein executed another note to First American establishing a second line of credit that was also used for the benefit of the debtor company. *Id.* Throughout 1986 and 1987, the debtor company drew on both lines of credit and sent the payments directly to First American even though the company had no direct obligation to First American. *Id.* Ultimately, the debtor com-pany filed a bankruptcy petition, and the trustee filed a complaint seeking to recover the payments from the debtor company to First American, contending the payments were fraudulent transfers. *Id.*

The trustee argued that the debtor company, who had no con-tractual obligation to First American, obtained nothing in exchange for its payments to the bank and, therefore, did not receive reason-

ably equivalent value. *Id.* at 484-85. The Fourth Circuit rejected that argument, explaining that "[i]t is well settled that reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule." *Id.* at 485. The Court explained that " '[a] debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person. . . .' " *Id.* (quoting *Rubin*, 661 F.2d at 991-92). The Court stressed that "the focus is whether the net effect of the transaction has depleted the bankruptcy estate." *Id.*

The Court then held:

> It seems apparent that the transfers have not resulted in the depletion of the bankruptcy estate. The transfers by the debtor served simply as repayment for money received. Other creditors should not be able to complain when the bankruptcy estate has received all of the money which it is obligated to repay. Otherwise, the creditors would receive not only the benefit of the money received from the draws on the lines of credit, but also the windfall of avoided transfers designed to repay the draws. In essence, the estate, and hence the unsecured creditors, would be paid twice. Consequently, we hold that no fraudulent transfer occurred.

*Id.*

The Receiver attempts to distinguish *Bigelow* on the basis that the debtor company executed a note to Donatelli & Klein in the same amount as the line of credit, and, therefore, as the debtor company made payments to First American, its liability on the note to Donatelli & Klein decreased. The Receiver has, however, overlooked the fact that there were two lines of credit issued for the benefit of the debtor company, and the debtor company only issued a note back to Donatelli & Klein on one of those lines. *Bigelow* is materially indistinguishable from this case with respect to the second line of credit.

The Ninth Circuit followed the reasoning of *Bigelow* in *In re Northern Merchandise, Inc.*, 371 F.3d 1056, 1059 (9th Cir. 2004). The debtor company in *Northern Merchandise* wanted a loan for working capital, but the bank refused to make a loan to the debtor company, instead offering to lend the needed money, $150,000.00, to the debtor company's individual shareholders. *Id.* at 1057. The bank understood that the shareholders would allow the debtor company to use the loan proceeds to fund its operations, and the loan was structured so

that the proceeds were deposited directly into the debtor company's banking account. *Id.* The transaction, however, was documented as a loan to the shareholders. *Id.* at 1057-58. On the same day that the shareholders entered into the loan with the bank, the debtor company executed a commercial security agreement giving the bank a security interest in its inventory, chattel paper, accounts, equipment, and general intangibles. *Id.* at 1058.

Several months later, the debtor company went out of business leaving $875,000.00 in unsecured debt. At that time, the debtor company had approximately $400,000.00 worth of inventory that it transferred to Benjamin News Group, a company owned by its shareholder Paul Benjamin, for $125,000.00. *Id.* Benjamin News Group paid the $125,000.00 to the bank, rather than the debtor company, as repayment for the loan. *Id.*

Creditors of the debtor company filed an involuntary Chapter 7 petition against the debtor company, and the trustee filed a complaint against the bank, arguing that the grant of the security interest and the $125,000.00 transfer were fraudulent conveyances. *Id.* On appeal, the bank argued that the bankruptcy court erred in finding a fraudulent conveyance because the debtor company received reasonably equivalent value for the transfers. *Id.* The Ninth Circuit, citing *Bigelow*, agreed, holding:

> Although Debtor was not a party to the October loan, it clearly received a benefit from that loan. In fact, [the bank] deposited the $150,000 proceeds of the October Loan directly into Debtor's checking account. Because Debtor benefited [sic] from the October Loan in the amount of $150,000, its grant of a security interest to [the bank] to secure Shareholder's indebtedness on that loan, which totaled $150,000, resulted in no net loss to Debtor's estate nor the funds available to the unsecured creditors. To hold otherwise would result in an unintended $150,000 windfall to Debtor's estate. Accordingly, Debtor received reasonably equivalent value in exchange for the security interest it granted to [the bank].

*Id.* at 1059.

In sum, in *Bigelow*, the debtor company's owner obtained a loan from the bank in the owner's name, but the debtor company received all the loan proceeds and repaid the loan to the bank directly. The Fourth Circuit held the debtor company received reasonably equivalent value because it had received the proceeds of the loan and its

repayments reduced that debt. In *Northern Merchandise*, the company's shareholders obtained a loan from the bank in their name, but the loan proceeds went directly to the company, and the company granted the bank a security interest in its corporate assets and paid $125,000.00 to the bank in repayment of the loan. The Ninth Circuit held that because the company benefitted from the loan even though it was not in the company's name, it received reasonably equivalent value in exchange for the security interest and $125,000.00 it transferred to the bank. Here, the third party defendants obtained the loan from the bank, but E. F. Merrell received the loan proceeds and made the repayments on the loan. Since the facts parallel those in *Bigelow* and *Northern Merchandise*, we think this is a case in which the indirect benefit rule should apply.

The Receiver argues, however, that this Court should focus on whether *at the time of the transfer of funds by the debtor*, the debtor received reasonably equivalent value in exchange. He contends that "[t]he record is devoid of any evidence that E. F. Merrell received any property or any other benefit from First Bank contemporaneously with any of the 32 transfers." This view is, however, contrary to the approach followed in the cases above. Their emphasis is not on whether value was received contemporaneously with the transfer, but on the net effect on the debtor's estate. *See, e.g., Rubin*, 661 F.2d at 992 ("In each of these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred."); *Bigelow*, 956 F.2d at 485 (stressing that "the focus is whether the net effect of the transaction has depleted the bankruptcy estate"); *Northern Merchandise*, 371 F.3d at 1059 ("[T]he primary focus . . . is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors."). Here, the Receiver has shown no net loss to the estate—the only reason the estate was at its existing level was because it received the loan proceeds in the first place.

In support of his position, the Receiver primarily relies on two cases from the federal bankruptcy courts: *In re Whaley*, 229 B.R. 767 (Bankr. D. Minn. 1999), and *In re Fox Bean Co.*, 287 B.R. 270 (Bankr. D. Idaho 2002), *aff'd*, 144 Fed. Appx. 697 (9th Cir. 2005). In *Whaley*, 229 B.R. at 770-71, the debtor used his funds to pay a credit card bill in the name of his girlfriend. The court held that the debtor had not received reasonably equivalent value in exchange for those pay-

ments, explaining that "[a] payment made *solely* for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor." *Id.* at 775. The court rejected the argument that "[t]he easing of personal strain that had resulted from the existence of the debt" or "the more general promotion of love, affection, or other personal tie" could constitute reasonable equivalent value. *Id.*

It also rejected the contention that the debtor received economic benefit from the expenditures funded by the original extension of credit, explaining that "the inquiry on reasonable equivalence goes solely to the exchange that included the subject transfer." *Id.* at 776. "[T]hat was the *satisfaction* of the debt, and not to any earlier transaction that may have created it." *Id.* "Because the Debtor was not liable on the debt, he received no direct or indirect benefit from its satisfaction." *Id.*

In *Fox Bean Co.*, 287 B.R. at 273-74, the other case cited by the Receiver, Mr. Fox, the sole proprietor of a bean trading business, opened a bank account and established a line of credit secured by a promissory note in his name that he used to fund his business. He subsequently incorporated his business as Fox Bean Company, Inc. *Id.* at 274. When the business suffered due to an uncollectible receivable, Mr. Fox authorized the bank to apply company funds to pay the note that had originally funded the business, but which was in Mr. Fox's name personally. *Id.* at 275. The company then filed for bankruptcy, and the trustee sought to recover the funds paid on the note. *Id.*

The bankruptcy court held that the trustee could avoid the transfer as constructively fraudulent, explaining:

> In this case, the Court finds Debtor received nothing of value in exchange for the March 14 transfer of funds that paid off the Fox note to Defendant. Viewed simply, Debtor's funds were used to pay off the debt of another entity. Further, testimony from the loan officer supervising collection of both the Fox note and Debtor's loan, and a review of the loan documents, confirm Debtor was not legally obligated to pay the loan, nor were any corporate assets used to secure the Fox note. In other words, when the Fox note was paid, Debtor received no benefit by having liens on corporate assets satisfied. Nothing in the record indicates that Debtor benefitted in any way, directly or indirectly,

from the transfer. The Court concludes that Debtor received less than a reasonably equivalent value in exchange for such transfer.

*Id.* at 281-82 (internal citations omitted).

While *Whaley* and *Fox Bean Co.* support the Receiver's position that we should look for a contemporaneous exchange of value for the transfer of funds, these cases are not controlling authority on the appellate courts of North Carolina. We find more persuasive the reasoning of the Second, Fourth, and Ninth Circuits to the contrary. We, therefore, adopt the reasoning of *Rubin, Bigelow,* and *Northern Merchandise* and hold that E. F. Merrell received reasonably equivalent value in exchange for its payments to First Bank.

The Receiver argues that even if E. F. Merrell received value in exchange for its transfers to First Bank, the trial court still erred in granting summary judgment because E. F. Merrell repaid over $200,000.00 more than the original loan proceeds, creating an issue of fact as to whether the value received was reasonably equivalent. Whether the value received is reasonably equivalent is often a question of fact. *See, e.g., In re Image Worldwide, Ltd.*, 139 F.3d 574, 576 (7th Cir. 1998) ("Whether 'reasonably equivalent value' was received in a transaction is a question of fact."); *In re S. Health Care of Arkansas, Inc.*, 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004) ("In the Eighth Circuit, the issue of whether a transfer is made for a reasonably equivalent value is a question of fact. . . .").

In *In re Erlewine*, 349 F.3d 205, 209 (5th Cir. 2003), however, the Fifth Circuit observed that although "the question of reasonable equivalence is usually a question of fact," "[c]ertain transactions, however, can give the debtor reasonably equivalent value as a matter of law." In this case, there is no dispute about the amount of the loan proceeds or the amount E. F. Merrell transferred to First Bank in repayment of the loans. The payments were the regularly scheduled monthly payments due to pay off the loan.

As First Bank points out, when paying off a loan, the borrower ends up paying more than originally borrowed as a result of interest due on the loan. The Receiver makes no argument that the amount of interest charged on the loans in this case was unreasonable and has cited no case requiring dollar-for-dollar equivalence. *See In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125-26 (5th Cir. 1993) (holding "the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value"). It is undisputed that E. F. Merrell had

CROOK v. KRC MGMT. CORP.

[206 N.C. App. 179 (2010)]

the benefit of the loan proceeds for eight years on the first loan and six years on the second loan. The Receiver has presented no evidence that the use of the money for that period is insufficient to constitute reasonably equivalent value for the amount over and above the loan proceeds.

We, therefore, hold that there is no genuine issue of fact as to whether the value received was reasonably equivalent. Consequently, the trial court did not err in entering summary judgment in favor of First Bank.

Affirmed.

Judges ROBERT C. HUNTER and CALABRIA concur.