IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-647

Filed: 5 September 2017

Swain County, No. 14 CVS 238

CONLEYS CREEK LIMITED PARTNERSHIP, a North Carolina limited Partnership, and MARSHALL CORNBLUM, Plaintiffs,

AND

MICHAEL CORNBLUM, MADELINE CORNBLUM, M&D CREEK, INC., a North Carolina corporation, CORNDERMAY PARTNERS, by and through its general partners, M&D Creek, Inc. and other unknown partners, and SMCC CLUBHOUSE, LLC, a North Carolina limited liability company, Counterclaim Defendants,

v.

SMOKY MOUNTAIN COUNTRY CLUB PROPERTY OWNERS ASSOCIATION, INC., a North Carolina nonprofit corporation, Defendant, Counterclaimant,

WILLIAM SPUTE, RONALD SHULMAN, and CLAUDETTE KRIZEK, Defendants,

AND

ROBERT YOUNG, Defendant in Counterclaim of SMCC Clubhouse.

Appeal by Smoky Mountain Country Club Property Owners Association from two orders entered in Swain County Superior Court: (1) order entered 30 July 2015 by Judge Tanya T. Wallace and (2) order entered 26 January 2016 by Judge Marvin P. Pope, Jr. Cross-appeal by SMCC Clubhouse, LLC, from summary judgment order

entered 26 January 2016 by Judge Marvin P. Pope, Jr., in Swain County Superior Court. Heard in the Court of Appeals 8 June 2017.[1]

> *Sigmon Law, PLLC, by Mark R. Sigmon and Sanford L. Steelman, Jr., for Conleys Creek Limited Partnership, Marshall Cornblum, Michael Cornblum, Madeline Cornblum, M&D Creek, Inc., Corndermay Partners, Counterclaim Defendants/Plaintiffs-Appellees, and SMCC Clubhouse, LLC, Counterclaim Defendant/Cross-Appellant.*

> *James W. Kilbourne, Jr., for Smoky Mountain Country Club Property Owners Association, Inc., Defendant-Counterclaimant/Appellant.*

DILLON, Judge.

Smoky Mountain Country Club (the "Planned Community") is a residential planned community located in Swain County. This matter involves a dispute between the Planned Community's developer (the "Developer") and the Planned Community's homeowners association (the "Association"). The Developer consists of members of the Cornblum family and entities they control and are listed above the "v." in the caption. The Association includes the homeowners association and certain members of its board of directors and are listed below the "v." in the caption.

## I. Factual Background

---

[1] This matter was originally heard in this Court on 1 December 2016. We filed an opinion on 4 April 2017. However, we withdrew that opinion. Shortly thereafter, Judge McCullough, who was on the original panel, resigned from this Court. This matter was heard again on 8 June 2017, with Judge Stroud replacing Judge McCullough on the panel.

The Planned Community is located on 195 acres (the "Property"). It was established in 1999 pursuant to a declaration (the "1999 Declaration") recorded by the Developer. Prior to 1999, the Developer had developed two residential communities on different portions of the Property. The Planned Community consolidated these communities along with the Property's undeveloped portions into a new single community.

The Association's board was initially controlled by the Developer. This dispute arose shortly after the homeowners gained control of the board in 2014.

## II. Procedural Background

Shortly after the homeowners took control of the Association board, the board voted to disregard certain provisions in the 1999 Declaration. In response to the board action, the Developer commenced this action against the Association. The Association responded by asserting a number of counterclaims against the Developer. In a series of orders, the trial court has dismissed a number of the claims and counterclaims from which this appeal arises.

On appeal, the Association seeks review of two orders in which the trial court dismissed its counterclaims against the Developer. The Developer seeks review of a summary judgment order which dismissed many of its claims against the Association.[2]

---

[2] All other claims which have been pleaded in this matter have been dismissed and are not subject to this appeal.

III. Analysis

In its brief, the Association contests trial court rulings concerning three different areas of dispute. The Developer's cross-appeal contests a trial court ruling concerning one of these areas. We address each area of dispute in turn.

A. Status of the Planned Community's Condo Units

The first area of dispute concerns the legal status of the Planned Community's condominium-style residential units which were established, developed, and sold by the Developer in accordance with the 1999 Declaration.

Specifically, the Planned Community includes single-family residences and townhomes, separated from adjacent residences by vertical property boundaries. The Planned Community also includes multi-story buildings with residences (the "condo units") located on each floor. Each condo unit is separated by vertical boundaries from other condo units on the same floor and by horizontal boundaries from condo units located on different floors.

Pursuant to the 1999 Declaration, each condo unit owner acquired an interest in real estate which does not fit the technical definition of "condominium" found in our Condominium Act. More specifically, the condo unit owners own the air space and interior walls within their respective units, but the Association owns the common areas of the condo buildings and condo building lots. In contrast, the Condominium Act states that property is not a "condominium" as defined by that Act *unless* the

common areas are owned by the unit owners, in common, rather than owned by an association. N.C. Gen. Stat. § 47C-1-103(7) ("Real estate is not a condominium unless the undivided interests in the common elements are vested in the unit owners.").[3]

Based on the inconsistency between the 1999 Declaration and the Condominium Act, the Association sought (1) a declaratory judgment stating that the form of ownership held by the Planned Community's condo unit owners is illegal under North Carolina law and (2) a reformation of the provisions of the 1999 Declaration concerning the condo units to conform with our Condominium Act.

The trial court granted the Developer's Rule 12(b)(6) motions with respect to these counterclaims, without stating its reasoning. For the reasons stated below, we reverse the trial court's dismissal of the Association's declaration counterclaim. We affirm, however, the trial court's dismissal of the Association's reformation counterclaim.

1. Declaratory Counterclaim---Validity of Form of Ownership

The condo units established by the 1999 Declaration – where the common areas within the condo buildings and condo building lots are owned by the Association and *not* by the condo unit owners in common – would be permissible *under the common law*:

---

[3] In everyday parlance, the word "condominium" or "condo" sometimes refers to an individual condo unit. In the Condominium Act, however, the word "condominium" refers to the entire condominium community, which contains all of the units and common areas.

> At common law, the holder of a fee simple also owned the earth beneath and the air above – "*cujus est solum, ejus usuqe ad coelom et ad inferos*".[4] This law applies in North Carolina. Plaintiffs concede that air rights are thus a part of land ownership, but they argue that absent specific authority, the holder of a fee simple may not divide his fee horizontally. . . . It appears[,] [however,] to be the general rule that *absent some specific restraint*, the holder of a fee simple may divide his fee in any manner he or she chooses.

*Cheape v. Chapel Hill*, 320 N.C. 549, 563, 359 S.E.2d 792, 800 (1987) (emphasis added) (internal citations omitted). The General Assembly, however, has abrogated the common law by establishing a "specific restraint" against the form of ownership established by the 1999 Declaration through the passage of the Planned Community Act. Specifically, the Planned Community Act *requires* that residential real estate with horizontal boundaries and located within a planned community "shall" meet the definition of "condominium" as set forth in the Condominium Act, as explained below.

In 1985, thirteen years before enacting the Planned Community Act, the General Assembly enacted the Condominium Act. By its terms, the Condominium Act regulates those properties which fit the Act's definition of "condominium." Properties with horizontal boundaries which do not fit the Act's definition of

---

[4]Translation of italicized Latin phrase in the quote is "whoever's is the soil, it is theirs all the way to Heaven and all the way to hell."

"condominium" are not expressly forbidden by the Act; rather, such properties are simply not subject to the provisions of the Act.[5]

In 1998, thirteen years after the Condominium Act became law, the General Assembly passed the Planned Community Act to govern planned communities. The Planned Community Act allows properties within a planned community to have horizontal boundaries but forbids the type of ownership established by the 1999 Declaration. Specifically, the North Carolina Comment to N.C. Gen. Stat. § 47F-1-101 expresses the General Assembly's intent that residences within a planned community which has horizontal boundaries must be a "condominium" as defined by the Condominium Act:

> It is understood and intended that any [planned community] development which incorporates or permits horizontal boundaries or divisions between the physical portions of the planned community designated for separate ownership or occupancy *will be created under and governed by the North Carolina Condominium Act* and not this Act.

N.C. Gen. Stat. § 47F-1-101 cmt. 2 (emphasis added.)[6]

---

[5] The "Official Comment" to N.C. Gen. Stat. § 47C-1-103 states that "unless the ownership interest in the common elements is vested in the owners of the units, the project is not a condominium. . . . Such projects may have many of the attributes of condominiums, but they are not covered by [the Condominium] Act"). N.C. Gen. Stat. § 47C-1-103 cmt. 5.

[6] The North Carolina Comment is not technically part of the Act's statutory language. However, the General Assembly authorized that the comments be printed with the Act. Specifically, Section 2 of the session law which enacted the Planned Community Act states that the General Assembly's "Revisor of Statutes shall cause to be printed with this act all relevant portions of the official comments to the [Act] and all explanatory comments of the drafters of this act, as the Revisor deems appropriate." North Carolina Planned Community Act of October 15, 1998, ch. 199, sec. 2, 1998 N.C. Sess. Laws at 691.

Based on the foregoing, we conclude that the Association is entitled to an order declaring that the 1999 Declaration establishes a form of property ownership in the Planned Community's condo units not recognized in North Carolina. Therefore, we reverse the order of the trial court dismissing the Association's counterclaim and remand the matter to enter judgment for the Association on this counterclaim. Such judgment, of course, would not affect the rights of those not parties to this action.

2. Reformation Claim

The Association's counterclaim seeking reformation of the 1999 Declaration provisions relating to the condo units was properly dismissed. Any reformation order would necessarily affect the ownership interests of these condo unit owners in certain common areas; and, therefore, they are necessary parties. *See NCDOT v. Fernwood Hill*, 185 N.C. App. 633, 636-37, 649 S.E.2d 433, 436 (2007); *NCDOT v. Stagecoach Village*, 174 N.C. App. 825, 622 S.E.2d 142 (2005); N.C. Gen. Stat. § 1A-1, Rule 19(a)(2015). Also, any reformation order would decide whether the condo units would be subject to a single condominium association or whether each condo building would be governed by a separate association. Without all necessary parties, the trial court and this Court lack the authority to decide the reformation claim. *See Rice v.*

*Randolph*, 96 N.C. App. 112, 113, 384 S.E.2d 295, 297 (1989). Therefore, we affirm Judge Pope's order dismissing the Association's reformation counterclaim.[7]

We note that the Planned Community Association may own the common elements of the Planned Community at large. The common elements of the condominium portion of the Planned Community, however, may not be owned by the Association but must be held in common by the condo unit owners in common. The condo unit owners are still part of the Planned Community and subject to the 1999 Declaration pertaining to common elements of the Planned Community, *see* N.C. Gen. Stat. § 47F-1-103 (providing that real estate comprising a condominium may be part of a planned community), notwithstanding the fact that they are also subject to a condominium association, *see* N.C. Gen. Stat. § 47C-3-101 (requiring that a condominium association be organized where a condominium is established).

B. The Clubhouse Dispute

The second dispute between the Developer and the Association concerns the Planned Development's clubhouse amenity (the "Clubhouse"). Pursuant to the 1999 Declaration, ownership of the Clubhouse remains with the Developer in perpetuity, never to be turned over to the Association; and the Association is required in

---

[7] Our holding should not be construed as an opinion that the property rights of the owners of the condominium-styled residences are, at present, unmarketable. *See* N.C. Gen. Stat. § 47F-2-103(d) ("Title to a lot and common elements is not rendered unmarketable or otherwise affected by reason of an insubstantial failure of the declaration to comply with this Chapter. Whether a substantial failure to comply with this Chapter impairs marketability shall be determined by the law of this State relating to marketability.")

perpetuity to assess dues (the "Clubhouse Dues") from the homeowners and remit them to the Developer.  Specifically, the 1999 Declaration provided as follows:

> Declarant shall grant to the Association and the Owners . . . a perpetual nonexclusive right to use the [Clubhouse], and each Owner, in consideration thereof, shall pay the Clubhouse Dues to the Association, and the Association shall pay all of the Clubhouse Dues collected . . . to Declarant.  The obligation of each Owner to pay Clubhouse Dues to the Association shall be absolute for the entire period of time that such Owner is an Owner . . . , and shall not be dependent on such Owner's actual use of the [Clubhouse].  The Association shall bill and collect the Clubhouse Dues from each Owner . . . [and] shall pay the total collected amount of Clubhouse dues to Declarant.

After control of the Association's board was assumed by the homeowners, the board voted to stop honoring this obligation to assess and collect the Clubhouse Dues for the Developer.

In this action, the Developer and the Association have asserted a number of claims and counterclaims regarding the Clubhouse Dues, all of which have been dismissed in a series of orders by the trial court.

For the reasons below, we conclude that the Planned Community Act does not forbid the arrangement established in the 1999 Declaration, whereby (1) the Developer retains ownership of the Clubhouse amenity; (2) the Association is authorized to assess dues from its homeowners to pay the Developer for the right to use the amenity; and (3) the Association is obligated to assess its homeowners for the Clubhouse Dues and remit them to the Developer.  (We note that the Planned

Community Act does allow that when homeowners take control of an association board from the developer, the association may relieve itself of obligations made on its behalf by the developer, where it is found that the arrangement was "not bona fide or was unconscionable[.]" N.C. Gen. Stat. § 47F-3-105.) We address the Association's counterclaims and the Developer's claims concerning the Clubhouse dispute in turn below.

### 1. Association Clubhouse Dispute Counterclaims

The Association asserted four prayers for relief relating to the Clubhouse dispute which were dismissed by the trial court. For the reasons stated below, we affirm the dismissal as to three of these prayers for relief, but not based on the legal reasoning of the trial court. [8]

The trial court's legal justification for dismissing the Association's claims concerning the Clubhouse dispute was that the claims were time-barred by N.C. Gen. Stat. § 47F-2-117(b). This statute provides that "[n]o action to challenge the validity of an *amendment* [to a declaration] adopted pursuant to this section may be brought

---

[8] The Association has not made any argument on appeal regarding the dismissal of the fourth prayer for relief and is therefore abandoned. Developer contends that the Association's failure to contest the dismissal of one prayer for relief prevents the Association from arguing its other claims. We disagree. While it is true that Rule 28 of our Appellate Rules provides that *issues* not presented in a party's brief are deemed abandoned, N.C. R. App. P. 28(b)(6), this does not affect the party's right to appeal "[f]rom any final judgment of a superior court[.]" N.C. Gen. Stat. § 7A-27(b)(1)(2015).

*more than one year* after the amendment is recorded." N.C. Gen. Stat. § 47F-2-117(b) (2015) (emphasis added).

We conclude that G.S. 47F-2-117(b) *does not apply* to the 1999 Declaration and that, therefore, the trial court erred by relying on this statute as its justification for dismissing the claims.[9] Specifically, one-year time limit contained in G.S. 47F-2-117(b) – by its plain language – only applies to challenges to "amendments" to an existing declaration, not to challenges to the declaration itself. Here, though, the 1999 Declaration was not an "amendment" of the prior declarations recorded by the Developer concerning the Property. Rather, the 1999 Declaration was a *new* declaration, and the prior declarations recorded by the Developer governing the predecessor communities developed on the Property were terminated.

Specifically, the Planned Community Act does not view the process by which communities subject to separate declarations are merged into one community as an *amendment* to the former declarations. Rather, the Act treats this process as a *merger* which essentially terminates the former planned communities/declarations and establishes a *new planned community* subject to a new declaration.[10] *See* N.C. Gen. Stat. § 47-2-121 (2015).

---

[9] We need not – and do not – reach the issue of whether G.S. 47F-2-117(b) is, in fact, a statute of repose.

[10] Under the Act, a merger requires the approval of the same percentage of owners which must approve a termination, not the lower percentage needed to approve an amendment. *See* N.C. Gen. Stat. § 47F-2-121. And under the Act, a termination (and therefore a merger) requires the approval

We note that the 1999 Declaration refers to itself as an "amendment." However, it also states that the *two* prior declarations "shall be . . . of no further force and effect for any purpose whatsoever, and [shall be] replaced in their entirety by the [1999] Declaration." Whether labelled as an amendment or not, it is clear that the 1999 Declaration "merged or consolidated" two former planned communities "into a single planned community." *See* N.C. Gen. Stat. § 47F-2-121(a).

Notwithstanding its reliance on G.S. 47F-2-117(b), we conclude that the trial court properly dismissed the Association's counterclaims concerning the Clubhouse Dues dispute, though for a different reason, as explained below.

### a. Clubhouse Dues

The Association prayed for (1) a declaration that "the Association has no duty under the law to collect Clubhouse Dues from owners and that any such duty stated in the Declaration is null and void[,]" and (2) the repayment of "all Clubhouse Dues improperly collected and paid [to the Developer]."

The Association argues in its brief that the Planned Community Act does not authorize it to collect dues from its homeowners to pay to a third party for use of property that is not part of the Planned Community. The Association essentially

---

of 80% of the owners. *See* N.C. Gen. Stat. § 47F-2-118. Here, it appears that one of the two former communities approved the merger with 99% of the vote and the other with 75% of the vote. We note that neither party has made any argument concerning the validity of the adoption of the 1999 Declaration, and all parties have been acting for almost two decades as if the 1999 Declaration was validly approved.

argues that the Act, specifically N.C. Gen. Stat. § 47F-3-102(10),[11] only allows an association to assess dues for "common elements" and that the Clubhouse is *not* a common element.

We conclude that the Association's argument is unpersuasive for two reasons. First, N.C. Gen. Stat. § 47F-3-102, which enumerates certain powers enjoyed by planned community's associations, is not the sole source of authority for an association. Indeed, the Act states that *it is the declaration* of a planned community which "form[s] the basis for the legal authority for the planned community to act" so long as the declaration is "not inconsistent with the provisions of [the Act]." N.C. Gen. Stat. § 47F-2-103(a). And here, the 1999 Declaration has expressly authorized the Association to assess its homeowners the Clubhouse Dues.

We conclude that that the General Assembly did not intend N.C. Gen. Stat. § 47F-3-102 to *limit* the power of a planned community's association. Rather, its plain language – which begins with "[u]nless . . . the declaration expressly provides to the contrary, the association may . . ." – indicates that the General Assembly intended for N.C. Gen. Stat. § 47F-3-102 to provide powers to an association *in addition* to those already provided to it by its declaration, provided that the declaration is silent

---

[11] The Association did not plead or argue any other theory. For instance, it did not contend that the Declaration was valid but that the Association had the right to terminate its obligation to collect the Clubhouse Dues based on N.C. Gen. Stat. § 47F-3-105 (2015), which allows an association to terminate any contractual obligation put in place by a declarant that is not *bona fide* or is unconscionable to the owners within the planned community.

regarding said powers. Further, the Association has not pointed to any other provision in the Act which prevents a declaration from authorizing an association to enter into a contract with a third party (here, the Developer) to provide an amenity for the homeowners and to assess the homeowners for the costs associated with the contract. Therefore, since the 1999 Declaration specifically authorizes the Association to assess its homeowners for the Clubhouse Dues, and since the Act does not proscribe the granting of this power to an association, we overrule the Association's argument.

Second, presuming that N.C. Gen. Stat. § 47F-3-102 is controlling, this section authorizes the Association to collect the Clubhouse Dues. For instance, N.C. Gen. Stat. § 47F-3-102(10) states that, unless otherwise prohibited by the declaration, a planned community association has the power to "[i]mpose and receive any payments, fees or charges" not only for the use of "common elements" but also "for services provided to lot owners[.]" Though the Clubhouse is not a "common element" of the Planned Community, *see* N.C. Gen. Stat. § 47F-1-103(4) (defining a common element as "any real estate within a planned community owned or leased by the association"), G.S. 47F-3-102 also empowers an association to assess dues for "services." And, here, the Developer's role of providing access to and maintaining a clubhouse amenity is a "service."

b. Real and Personal Covenants

The Association argues that we are bound by *Midsouth Golf, LLC v. Fairfield*, 187 N.C. App. 22, 652 S.E.2d 378 (2007) and other cases to conclude that the obligations imposed in the 1999 Declaration for the payment of Clubhouse Dues are *personal* covenants rather than *real* covenants, and are therefore unenforceable by the Developer in this case. We disagree.

*Midsouth Golf* is one of three opinions from our Court involving a residential community and a golf course amenity owned by a third party. Those appeals dealt with covenants contained within declarations which essentially required the developer and its successors to maintain a golf course amenity for the homeowners and for the homeowners to pay dues for the amenity. In a series of three decisions, panels of our Court held that (1) the covenant which created the homeowners' obligation to pay the dues was a personal covenant, and therefore, was unenforceable against those who bought homes from the original owners and (2) despite this holding, any successor to the developer had a continuing obligation to maintain the golf courses amenity, even if only one homeowner chose to continue paying the dues. *See id.*; *Fairfield v. Midsouth Golf*, 215 N.C. App. 66, 715 S.E.2d 273 (2011); *Waterford v. Midsouth Golf*, 215 N.C. App. 394, 716 S.E.2d 87 (2011). These three opinions from our Court are discussed in the opinion issued in a subsequent federal proceeding involving the bankruptcy of the successor to the developer who owned the golf course-amenity owner. *See In re Midsouth Golf*, 549 B.R. 156, 169 (2016). Of significance,

bankruptcy judge noted that our Court, in determining that the association had the right to enforce the covenant, applied the law of contract, and not the law of real and personal covenants: "Those covenants specifically identify the property owners' association [] as an entity authorized to enforce the provisions therein against the property owner[.] As between those parties and in that context, the inquiry is a basic matter of contract law. Whether the [] covenant was 'real' or 'personal' was both immaterial to and wholly outside the scope of the [North Carolina Court of Appeals'] analyses." *Id.*

In the present action, the Developer has not sued the homeowners themselves to enforce any covenant. Indeed, the homeowners are not parties. Rather, the Developer has asserted claims against the Association to enforce the Association's obligation under the 1999 Declaration to pay money to the Developer. This obligation is contractual in nature, and whether this obligation is real or personal is irrelevant to our analysis, since the Association is the original party expressly obligated under the 1999 Declaration. *See id.*

We make no ruling regarding the obligation of the homeowners themselves to pay Clubhouse Dues to the Association, as they are not parties to this action. We only note that homeowners within a planned community are generally obligated to respect not only real covenants governing their property, but also to pay any dues which are assessed by their association.

2. Developer's Clubhouse Dispute Claims

Developer, through its entity which owns the Clubhouse, has asserted four claims against the Association relating to the Association's refusal to continue assessing Clubhouse Dues. Judge Pope granted the Association's summary judgment motion on all four claims.[12] Developer appealed. We affirm in part and reverse and remand in part.

a. Breach of Contract and the Covenant of Good Faith and Fair Dealing

The first claim asserted by the Developer was for breach of contract and breach of the covenant of good faith and fair dealing, based on the Association's decision not to honor its obligation in the 1999 Declaration to assess and remit Clubhouse Dues. We hold that the Developer met its burden to survive summary judgment; and, therefore, we reverse that portion of the order granting summary judgment on the claim.

The terms of the 1999 Declaration clearly establish obligations which are contractual in nature between the owner of the Clubhouse and the Association:

> Declarant shall grant to the Association and the [homeowners] a perpetual nonexclusive right to use the Clubhouse Use Facilities, and each Owner, in consideration thereof, shall pay the Clubhouse Dues to the Association, and the Association shall pay all of the Clubhouse Dues collected from Owners to Declarant.

---

[12] Developer has made no argument on appeal regarding the trial court's grant of summary judgment on its claim for libel *per se*, and therefore we regard this claim as abandoned. *See* N.C. R. App. P. 21.

> . . . The Association shall bill and collect the Clubhouse Dues from each Owner on a current basis, and . . . shall pay the total collected amount of Clubhouse Dues to Declarant.

The language of the 1999 Declaration clearly obligates the Association to bill and collect Clubhouse dues and to pay the total collected amount of Clubhouse Dues to the Declarant. The fact that the original Declarant does not currently hold title to the Clubhouse because title was transferred to another Developer-controlled entity is irrelevant. The 1999 Declaration provides that its provisions and all of its covenants would be "binding upon Declarant, its successors and assigns[.]"

"When the language of a contract is clear and unambiguous, effect must be given to its terms, and the court, under the guise of constructions, cannot reject what the parties inserted or insert what the parties elected to omit." *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962).

The Developer produced evidence tending to show that the Association sent a message to its homeowners that the Association "would no longer bill for or collect Clubhouse Dues," that monthly payments "would no longer include Clubhouse Dues," and that members of the Association were "not required" to belong to the Clubhouse and "may opt out if they so desire." The evidence clearly creates a genuine issue of fact regarding the Developer's breach of contract and good faith claims. Of course, at trial the Association may bring forth evidence that conflicts with the Developer's

evidence or which shows that the provisions in the 1999 Declaration are not 'bona fide" or are "unconscionable." *See* N.C. Gen. Stat. § 47F-3-105.[13]

b. Civil Conspiracy and Unfair or Deceptive Acts or Practices

The Developer asserted a claim for civil conspiracy against the Association and its members. In order to establish a claim for civil conspiracy, a party must allege (1) the existence of a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a proximate result of the conspiracy. *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008). The doctrine of intra-corporate immunity provides that because "at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself." *State ex rel. Cooper v. Ridgeway*, 84 N.C. App. 613, 625, 646 S.E.2d 790, 799 (2007), *rev'd on other grounds*, *State ex rel. Cooper*, 362 N.C. 431, 666 S.E.2d 107 (2008).

Here, we conclude that the trial court properly granted summary judgment for the Association on Developer's civil conspiracy claim because the Association, as a corporation, cannot conspire with itself. *See id.* There is no allegation that the

---

[13] We note that the Condominium Act provides that a condominium association may terminate *any* "contract or lease between the association and a declarant" *even if* the contract is not found to be unconscionable. N.C. Gen. Stat. § 47C-3-105. The General Assembly, though, did not see fit to include this additional protection for planned community associations in the Planned Community Act. Here, any dispute regarding the provisions of the 1999 Declaration is governed by the Planned Community Act, and not the Condominium Act, notwithstanding that there are condo units located within the Planned Community.

Association conspired with any third party regarding the Clubhouse Dues. We further affirm the trial court's grant of summary judgment dismissing the Developer's claim for damages for unfair or deceptive acts or practices, as this claim is based on the alleged civil conspiracy.

### C. Association Counterclaims

The third area of dispute challenged in this appeal concerns a number of counterclaims asserted by the Association against members of the Cornblum family for alleged self-dealing. We address each counterclaim in turn.

### 1. Breach of Fiduciary Duty

In its third counterclaim, the Association sought damages for breach of fiduciary duty by Michael Cornblum, Carolyn Cornblum and the Cornblum-controlled entity which served as the declarant (the "Declarant") in the 1999 Declaration.[14] We affirm the dismissal as to the Association's counterclaim against the Declarant. However, we reverse as to Michael Cornblum and Carolyn Cornblum.

"A claim for breach of fiduciary duty requires the existence of a fiduciary duty." *Governors Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 247, 567 S.E.2d 781, 786 (2003).

We agree with the Developer that the trial court properly dismissed this counterclaim because its relationship with the Association was contractual. *See*

---

[14] The first two counterclaims concern the legal status of the condominium-style units addressed in section III.A. of this opinion.

*Highland Paving Co., LLC v. First Bank*, 227 N.C. App. 36, 43, 742 S.E.2d 287, 292-93 (2013) ("[P]arties to a contract do not thereby become each other's fiduciaries[.]"). A declarant is not required to put the interests of the association ahead of its own in every instance when it sets up a planned community, as generally would be required of a fiduciary. Indeed, a declarant is allowed to reserve rights to itself and enter into contractual relationships between itself and the association.

However, while serving as *directors* and *officers* of the Association, Michael and Carolyn Cornblum certainly *did* owe a fiduciary duty to the Association. *See Governors Club*, 152 N.C. App. at 248, 567 S.E.2d at 786-87 (citing *Underwood v. Stafford*, 270 N.C. 700, 703, 155 S.E.2d 211, 213 (1967) (stating that under North Carolina Law, "directors of a corporation generally owe a fiduciary duty *to the corporation*"); *see also Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983).

N.C. Gen. Stat. § 55–8–30 requires a corporate director to discharge his or her duties as a director: (1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner the director reasonably believes to be in the best interests of the corporation. N.C. Gen. Stat. § 55-8-30(a)(1)-(3) (2015); *see also* N.C. Gen. Stat. § 55-8-42(a) (2015) ("An *officer* . . . shall discharge his duties . . . in a manner *the officer* reasonably believes to be in the best interests of the corporation.") (emphasis added). "Allegations of breach of fiduciary duty that do not rise to the level of constructive fraud are governed by the

three-year statute of limitations applicable to contract actions contained in N.C. Gen. Stat. § 1-52(1) (2003)." *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 66–67, 614 S.E.2d 328, 335 (2005) (citing *Tyson v. N.C.N.B.*, 305 N.C. 136, 142, 286 S.E.2d 561, 565 (1982)); *see* N.C. Gen. Stat. § 1-52(1) (2015).

The Association's counterclaim alleges that Carolyn Cornblum was an officer until 2014 and that Michael Cornblum was a director until 2014. The Association makes a number of allegations which, if true, tend to show that the Cornblums acted in their own interests and not in the best interests of the Association within the applicable limitations period. Accordingly, we hold that the trial court improperly dismissed the Association's counterclaim for breach of fiduciary duty as to Michael and Carolyn Cornblum.

## 2. Unfair and Deceptive Trade Practices

In its fourth counterclaim, the Association sought damages based on allegations that Michael Cornblum, Carolyn Cornblum, Madeline Cornblum and the Declarant committed unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 (2015). We affirm in part, and reverse in part.

Our Supreme Court has instructed that a claim under N.C. Gen. Stat. § 75-1.1 "does not extend to a business's internal operations, but rather extend to acts between a business with another business(es) *or* a business with a consumer(s). *White v. Thompson*, 364 N.C. 47, 52-53, 691 S.E.2d 676, 679-80 (2010). Here, as in *Thompson*,

the bad acts alleged by the Association "did not occur in . . . dealings with [other market participants]." *Thompson*, 364 N.C. at 54, 691 S.E.2d at 680. The purported misconduct by the Cornblum family was alleged to have taken place while members of the Cornblum family were controlling directors of the Association. Even taken as true, most of the allegations regarding the actions of the Declarant and the members of the Cornblum family are more properly classified as occurring within a single entity rather than "within commerce." *Id.*

We do note that some of the bad acts alleged by the Association deal with the Cornblum's marketing of the condo units in violation of North Carolina law. These acts were arguably "within commerce." However, none of the past or present condo unit owners are parties. Thus, we state no opinion and do not rule upon the issue of whether individual homeowners, who are not parties to this action, could state a valid Chapter 75 claim against the Cornblums.

Therefore, we conclude that the trial court properly dismissed the Association's claim for unfair and deceptive trade practices.

### 3. Breach of Covenant of Good Faith and Fair Dealing

In its fifth counterclaim, the Association sought damages based on an alleged breach of the covenant of good faith and fair dealing by the Declarant. To state a valid claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must plead that the party charged took action "which injure[d] the right of the other

to receive the benefits of the agreement," thus "depriv[ing] the other of the fruits of [the] bargain." *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C. 219, 228-29, 333 S.E.2d 299, 305 (1985).

We conclude that the Association's fifth counterclaim should not have been dismissed. The counterclaim does allege a contractual relationship, established in the Declaration itself. The Association alleged that "[the Declarant] imposed upon the owners [within the Planned Community] a declaration whose terms and provisions must be in good faith and fair dealing." We conclude that this counterclaim does state a claim for which relief could be granted, and, on this point, we reverse the order of the trial court.

## 4. Accounting

In its final counterclaim, the Association sought an equitable accounting of the Association's income and expenses and collection history during all periods of Declarant control. We dismiss this portion of the appeal as moot. We base our dismissal on the parties' agreement via a consent order that the Declarant would deliver all "books and records relating to the Association" in their custody or control. The consent order provided that these "books and records" would include financial records of the Association, including a schedule of all funds receivable for the payment of assessments. A determination on this counterclaim would have no practical effect in light of the consent order. *See Roberts v. Madison Cnty. Realtors Ass'n, Inc.*, 344

N.C. 394, 398–99, 474 S.E.2d 783, 787 (1996) ("A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy.").

## IV. Conclusion

We reverse Judge Wallace's order dismissing the Association's counterclaim seeking a declaration regarding the legal status of the Planned Community's condominium-style residences, and we direct the trial court on remand to enter judgment for the Association on this counterclaim, consistent with this opinion. We, however, affirm Judge Wallace's order dismissing the Association's counterclaim seeking reformation of the 1999 Declaration, based on the Association's failure to join all necessary parties as explained in this opinion. On remand, the trial court may, in its discretion, allow the Association for leave to amend to join necessary parties and to re-assert its reformation claim.

We affirm the trial court's order dismissing the Association's counterclaims relating to the Clubhouse dispute. We reverse the trial court's summary judgment on Developer's claim for breach of contract and breach of the covenant of good faith and fair dealing, and remand for further proceedings not inconsistent with this opinion. We affirm that summary judgment order as to the Developer's other claims.

We reverse Judge Pope's dismissal of the Association's third counterclaim for breach of fiduciary duty against Michael Cornblum and Carolyn Cornblum, and

remand for further proceedings not inconsistent with this opinion. We dismiss the Association's appeal of Judge Pope's dismissal of its counterclaim seeking an accounting, as moot. Judge Pope's dismissal of the remainder of the Association's counterclaims in that order is affirmed.

AFFIRMED IN PART, DISMISSED IN PART, REVERSED IN PART, AND REMANDED.

Judges STROUD and TYSON concur.